COFER, Justice,
for the Court:
Appellee sued appellants in the Chancery Court of Pearl River County for the cancellation of a deed he made to certain of appellants and to require all of appellants to return to him certain monies which he had allegedly caused to be invested in their names plus lawful interest earned on the invested funds. From a decree granting appellee all relief prayed by him other than solicitor’s fee, appellants have taken this appeal.
The suit is founded upon confidential relations allegedly existing between the adult parties with appellee being the subservient party, and the use of undue influence upon appellee in procuring the money sued for, described as appellee’s “life savings” and in the execution of the warranty deed by him.
Background information will tend to put the parties and the subject matter of the suit in proper perspective. Appellee B. R. (Richard or Rich) Glover was seventy-nine years of age on the dates crucial in this cause. Appellant, E. E. Glover, approximately seventy-seven years old then, and appellee are brothers. Mrs. Elizabeth Glover, one of the appellants, is the wife of appellant E. E. Glover. Appellant Donald G. Glover, forty-five years old at the time, is the son of E. E. Glover and stepson of Elizabeth Glover, appellants, and nephew of appellee. Appellants D. Suzanne Glover and Donald G. Glover, Jr., minor appellants (who have a guardian ad litem) are children of appellant Donald G. Glover and, of course, are blood grandchildren of appellant E. E. Glover, step-grandchildren of Elizabeth Glover, appellant, and are great niece and nephew of appellee.
Appellee and appellant E. E. Glover married sisters. Appellee’s wife became deceased in 1969 and appellee in 1970 was married to Mrs. Charity Miller, who departed this life on June 15,1976. Appellant and his first wife, to whom appellant Donald G. Glover was born, were divorced and Donald lived mostly with his mother and with ap-pellee and his wife, and for some long period of time had but slight association with his father, appellant E. E. Glover.
The close association of Donald with ap-pellee was described as being very much as a father-son relationship and Donald, on the witness stand, testified that the love between them was such as to lead to the conclusion that they felt toward each other as father and son.
In the early twenties, the brothers appel-lee and appellant Glover bought land and owned it together for a period of time, at the end of which, through no friction or disagreement on their part, they divided the property between them. At all times since this agreed .division, they have lived close together, much of the time about a quarter of a mile apart. This land of appellee, 200 acres in amount, is involved in this suit.
*169 Of six children in these brothers’ family, one sister survives, a patient in a rest home at Meridian. One of the deceased sisters, Mrs. Elizabeth Glover McClendon, left surviving her several children of whom, one, Paul, appears prominently in this suit.
Through the years, as long as they were physically able, these appellee and appellant brothers worked together, “through and through” in a sense, helping each other with the farming and livestock, and splitting income from construction contracts. Appel-lee is described as a carpenter and a farmer.
In the middle 1960’s appellant E. E. Glover became disabled and cooperative undertaking could not continue. For years these brothers and their wives visited back and forth with each other, and, if the visit was near a meal time, they ate together. After appellant Glover’s disability, the visiting was mostly by appellee, because of the difficulty of appellant Glover in getting about. This visitation continued until appellee went to the hospital as hereinafter to be noticed.
Appellee Glover developed a sight difficulty and had to undergo surgery in 1969 and appellant, Glover, his brother, with the help of another, fed appellee’s cattle the winter before the surgery. In addition to the sight difficulty, appellee had difficulty hearing.
Appellee was described as being a conservative man, inclined to be miserly with his money, and also was inclined to keep his confidence, to the extent of telling others at times to tend to their own business when he would be questioned about matters personal to him.
Appellee’s last wife, as related above, became deceased on June 15, 1976. Prior to that time, she underwent surgery and was a hospital patient. During this time, appellee was continuously concerned that he had sufficient funds to defray her expenses. Appellee and his last wife had a bank account in a bank in Bogalusa, Louisiana. For some reason not appearing in the record, she executed a power of attorney in favor of one Helen Buras under which power the said Helen Buras was undertaking to cash a time certificate which appellee and his wife had in a lock box and a dispute arose between appellee and her about her actions. Paul McClendon and two other nephews (not including appellant Donald) went with appellee to attorney E. B. Williams, Jr., at Poplarville, who worked out, with Mrs. Buras’ attorney, an understanding that the deposit would be removed to a bank in Poplarville, and she, with attorney Williams’ countersignature, would issue checks on it for the medical bills of the sick lady. The transfer of this money was effected June 9, 1976.
Appellee and these nephews discussed together disposition of appellee’s property and what the future had for him, his wife having then died. This was discussed by them with attorney Williams who abandoned the notion of a guardianship, feeling that appellee knew what he was doing and could handle his affairs.
While the altercation with Mrs. Buras was being worked out, appellee wanted attorney Williams to draw a will; thereafter he said he would like to make a deed, and, with the nephews outside his office, appel-lee told the attorney he would like to make a deed to two nieces in Texas and one of the nephews in Louisiana.
There is testimony, not disputed, in the record, that appellee refused to execute a will and Paul McClendon threw some keys in his lap and said to the effect that he was through with him.
Shortly after the death of appellee’s wife, appellant Donald Glover took him to Meridian where he remained with Donald for a matter of a few days.
Contrary to the testimony as to appellee’s expressed desires in Mr. Williams’ office, there is strong testimony that appellee desired that his land remain in the Glover name.
Appellee attended the three-day hearing until his restlessness and apparent discomfort caused the court to permit his attendant to roll him from the courtroom in the wheel chair which he occupied. Appellant E. E. Glover came to court in a wheel chair, *170 also, and the court was constrained to remove the hearing to another room more accessible to him for his testimony.
With review of pertinent background having been made, the two occurrences on which relief is here sought will now be noticed.
As pointed out above, appellee had money in a Bogalusa, Louisiana, bank. On a day prior to July 1,1976, appellant E. E. Glover called appellant Donald Glover, and on July 1, 1976, Donald went to his father E. E. Glover’s home, where appellee was, and out of appellee’s presence, E. E. Glover told Donald details as to appellee’s desires concerning the Bogalusa funds and some funds he had in a Poplarville bank. Donald took appellee in Donald’s car to Bogalusa and, as spokesman for appellee, caused withdrawal of the money on deposit there, which they carried back to the bank patronized by ap-pellee in Poplarville. There, with Donald continuing as spokesman for appellee, a sum of money was transferred on appellee’s signature, and put with the money from Bogalusa, and one-half the total of these sums was put in a six-year certificate of deposit in that bank, in the names of Donald G. Glover, Jr., and Mr. or Mrs. E. E. Glover, (the principal therein being $13,-498), and Donald and appellee took that bank’s cashier’s check in the amount of $13,497.97, the other half, and deposited it in a similar certificate in another Poplar-ville bank, in the names of D. Suzanne Glover and Mr. or Mrs. E. E. Glover. There is ample proof to the effect that appellee would have the interest on these deposits during his life.
On August 30, 1976, appellant Donald took appellee to attorney Williams’ office where administration proceedings were being prepared and Donald became a surety on appellee’s bond as administrator of the estate of appellee’s recently deceased wife. While there, appellee sent Donald to appel-lee’s home for the purpose of bringing a deed or deeds to him, which he brought.
On August 31, 1976, attorney Williams prepared and superintended the execution by appellee of a deed to the 200 acres of land of appellee hereinabove mentioned.
Near the end of November 1976, appellee filed suit to cancel that land deed and on February 12, 1977, he filed suit to recover the money involved in the first of these two transactions noticed above. On July 15, 1977, he filed an amended bill of complaint to recover the money and to set aside the deed.
In this last mentioned pleading appellee, as complainant, alleged that he had accumulated the realty and various other assets including, but not limited to, money, goods and chattels; that he has no children, that he had been in poor health during approximately the last two years; that, shortly after the death of his wife, appellants E. E. Glover and Donald G. Glover began to show special attention to him, although they had never done so before, this being at a time when he was in a weakened physical and emotional state, and through the exercise of undue influence, coercion, unconscionable advantage and persuasion, overreaching, infidelity, fraudulent conduct, gross abuse of confidence in a fiduciary capacity, and other acts, unduly pressured him, at a time when he was without his free will, to sign the deed complained of, the said conveyance being without consideration, no money exchanging hands, the named defendants making assertions and promises to him that they did not keep and have not kept and that without the undue influence over him he would not have executed the deeds to defendants.
He further alleged that the defendants took from him his life savings of $19,969.72 and $7,026.25 and deposited them as herein-above set out.
He further alleged that under the circumstances then and there existing in connection with the deed, it should be set aside for the reasons that it was without consideration and was the product of undue influence, it having been signed when he was of advanced age, sick, and in a weakened condition.
He averred that the deed and the money transaction were part of a total plan and *171 scheme of the adult defendants to strip him of all his assets, and that they have failed, after demand and request, to reconvey the land and restore the money to him, after he had recovered his physical and mental health to such extent that he realized defendants had wrongfully taken his property by various contrivances, and primarily Donald whose education, experience, and age gave him unequal and inequitable position in the swindle.
He also charged that the defendants waited until his bereavement and weakened condition deprived him of his free will, and brought undue influence upon him to take all of value he owned, and then promptly abandoned him to survive the best he could with the help of other friends and relatives.
At the end of the hearing, the chancellor made findings of fact and entered decree in favor of appellee. He found appellee to be presently non compos mentis; having had the land, the money, a car, truck, cattle and timber, appellee had been reduced to the status of a pauper with nothing but a life estate in the land conveyed; he was deaf, could see with difficulty, was asthmatic, unable to communicate, a condition in progress for a number of years; had lost his wife a few days prior to the first transaction and was grief-stricken; on the dates in question, (July 1 and August 31, 1976), defendants were advising and instructing him in his business; that there had then existed a fiduciary relationship wherein complainant-appellee placed trust in defendants-appellants, the appellants not only advising and instructing him, but transporting him in achieving the results sought; that the two transactions were part of the same design, and that complainant’s divesting himself of these properties without consideration and becoming a pauper would, in itself, indicate some abnormality, especially in view of complainant’s past history of conservatism.
He further held that complainant was, during the occurrences complained of, mentally and physically incompetent due to advanced age, hardening of arteries, deafness, near blindness, grief-stricken condition and was unduly influenced by defendants who stood in a fiduciary relation, and were thus prohibited by law from depriving complainant of his property as complained of. Early in his opinion the chancellor stated, “I’m inclined to believe that the struggle between his nephews about this property is more or less between themselves and the complainant is unfortunately in the middle.”
The decree, consistent with the chancellor’s opinion, restored the monies to complainant’s guardian, whom the court appointed for him, and set aside the deed. The banks where the money was invested were parties to the suit and were ordered to pay to the guardian all sums received in the transaction and all other sums deposited in complainant’s name.
On their appeal, appellants assigned as error, among other things, not to be reached herein, the chancellor’s action (1) in allowing the testimony of two medical doctors, Rennick and Stringer, “since their testimonies did not touch the dates of the execution of the document in question” and in permitting them to testify as to appel-lee’s mental condition; and (2) in holding the deed invalid for lack of consideration; and (3) the chancellor’s decision is against the overwhelming weight of the facts and applicable law.
We agree with the able chancellor in his conclusion that appellee was the innocent victim of a contest between his relatives. We find ourselves in disagreement with his finding both that there was a fiduciary, dominant, subservient relationship between appellee and the appellants, and in finding there was undue influence which resulted in the money transfer and the deed.
Taking up now these transactions, the record reveals that appellee was a party to arranging authority for appellant Mrs. Elizabeth Glover to write checks for a part of his maintenance which she did. A few weeks after the deed transaction, appellee was driving on the grounds of appellants E. E. Glover and Mrs. Elizabeth Glover and, blinded by the sun, ran into a tree causing discomfort to his right chest wall. On Octo *172 ber 8,1976, he was seen by Dr. Rennick and on October 11, 1976, appellant Mrs. Elizabeth Glover admitted him to the hospital. While the apparent main concern of the physician was a respiratory infection in the form of bronchitis, the doctor also found he had a chronic organic brain syndrome, a term used for people suffering from certain mental entities or abnormalities which fit together as a syndrome, in the case of elderly people frequently related to degeneration of metabolic processes in the brain and associated hardening of the arteries. He was found to be senile which indicates specific impairments of mental functions. The doctor said that, while the collision injury did not appear to be of any really important nature, it certainly might have some effect on his mental capacity, might have brought him down.
Dr. Stringer was appellee’s regular physician from April 1963 and last saw him professionally on September 27, 1977. In 1976 he observed deterioration in appellee’s mental functioning, resulting from arteriosclerosis, which affected his capacity to understand directions, and to communicate with others, caused some problem about relating to his environment. It is a gradual degeneration of cerebral tissue and appellee was observed as experiencing a gradual slipping in his mental capacity. Dr. Stringer saw him professionally on June 23, July 6, and August 9, all in 1976, and the doctor failed to testify about his mental faculties on those occasions, except what has above been shown in his general degeneration.
In addition to appellant Mrs. Elizabeth Glover’s admitting appellee to the hospital, appellant Donald and his wife visited him at least for a time in the hospital.
Somewhere during appellee’s stay in the hospital, or at least by November 19, 1976, Paul McClendon was again communicating with appellee and on that day appellee executed a document giving to him a general power of attorney, irrevocable for ten years from its date. On December 1,1976, appel-lee executed another power of attorney appointing Paul McClendon and his wife as attorneys-in-fact to administer all his affairs, and handle all his property, so long as they were willing, during appellee’s life and after his death. In the meantime, appellee and Paul McClendon, as his attorney-in-fact, entered into a timber contract on November 22, 1976, in which they were paid a cash consideration of $1,000 and the contract providing for a graduated pay scale for timber cut by the grantee. The timber cut and removed under this contract was estimated to run into about $20,000. Neither appellee (understandably) nor Paul McClendon testified in the case, and before a finding of pauperism might properly be made, it would seem some showing would have been in order as to what happened to these timber sale proceeds.
When appellee went home from the hospitalization discussed above, appellants were by their uncontradicted testimony prevented and barred from going to see him, and once, although it was known appellee was in the house, found a lock on his door. It is also uncontradicted that Paul McClen-don instituted prosecution proceedings against appellant Donald Glover on a charge of embezzlement. Disposition of these proceedings is not revealed in the record. It is our view that the allegations that appellants deprived appellee of all of his property and then abandoned him does not find support in this record.
Appellants never saw appellee again, before the trial, in December 1977, except on Christmas eve, 1976, when he came to the E. E. Glovers’ home and the uncontradicted proof is that he did not recognize appellant Mrs. Elizabeth Glover, his sister-in-law. The record reflects that appellee showed a marked mental decline during his second week in the hospital, and that he could not carry on a conversation. On the Christmas eve 1976 visit, he said he had seen appellant Elizabeth Glover but that he did not know her. At this time he wanted the money and land back which desire he had already expressed to them. They gave him no response, and the suit was brought.
Appellee, prior to the two transactions, had discussed with appellants E. E. Glover and Mrs. Elizabeth Glover many times how *173 he wanted his money and land handled. At a time before the arrival of appellant Donald Glover on July 1, 1976, by some means E. E. Glover knew appellee’s plan for handling the deposits and Donald transported appellee to Bogalusa and to the two banks in Poplarville on that day, and expressed to the bank officials as appellee’s spokesman what was desired at the three banks. Of these three banks only President Hack Smith, of the Bank of Commerce, was brought as a witness and testified as appel-lee’s witness. Donald and appellee sat at President Smith’s desk, and Donald told him what appellee wanted in handling the money brought from Bogalusa and the money in Smith’s bank. When Donald had finished detailing these desires, Smith turned to appellee and asked if he wanted the transactions Donald had explained, and repeated the inquiry more loudly to make sure he understood, and he indicated his approval by shaking his head. Smith was concerned because he knew appellee was a conservative man. Smith was satisfied that appellee knew what was happening to the extent that he, Smith, followed through with the request. Appellee signed a withdrawal slip and endorsed the cashier’s check from the Bogalusa bank.
Later he came alone to the bank and asked Mr. Smith where his money was, and later he came again, someone, Smith believed it was Paul McClendon, helping him in, and asked about his money.
We now consider the land transaction, after which proof touching both transactions will be noticed.
The record shows that Donald and appel-lee were in attorney Williams’ office on August- 30, 1976, in connection with the opening of an administration proceeding on the estate of appellee’s late wife; about that date, appellant E. E. Glover had called attorney Williams and expressed a desire for Williams to prepare for appellee a conveyance to E. E. Glover and Donald Glover as tenants by the entirety with right of survivorship with Richard Glover to reserve a life estate in the land being conveyed. On August 31, 1976, appellee went to attorney Williams’ office. There is a conflict as to whether Donald went with him, Williams saying that he did and sat on the outside, while Donald testified that he did not come from Meridian on that day and was not with appellee at Williams’ office. Nevertheless, with only Williams and appellee in Williams’ office and the door closed, Williams testified:
. and so Donald brought Richard Glover to the office and sat on the outside and he walked — Richard Glover walked in and he repeated almost word for word what Mr. E. E. Glover had told me over the telephone. He told me how he wanted the deed drawn. He was lucid and he described it and exactly well, he even mentioned what lands he wanted to go, exactly, — how he wanted the deed drawn and the fact that he wanted to reserve a life estate in the property. So, I wondered about the situation, and questioned him at length about the deed. And he seemed to understand it and I drew the deed so that he reserved a life estate in the oil, gas and minerals and the timber, trees, with the right to cut and remove and reserved a right of way to go on the land during his lifetime and cut and remove the timber. (Emphasis added).
When the deed was prepared, Williams, who knew and had represented all members of the family, and still entertaining some doubt, said further:
. so there wouldn’t be any taint or question about what I had done, I brought him up to the courthouse and let him talk to Mrs. Jerene Patterson, [deputy chancery clerk]. She questioned him, and I asked him in her presence if he understood what he was doing and he signed the deed before her and she took the acknowledgement. (Emphasis added).
Immediately, after this transaction Williams, back in his office said to appellee, “Mr. Glover, what about your money now? He said, ‘What money?’ So, then I realized — that something was wrong — that he was either suspicious of me or somebody *174 and for that reason he didn’t want anybody to know about the money that he had.” Williams further stated that he “would never have written the deed had I known what had happened.”
Thus, because appellee showed a preference not to discuss other business with attorney Williams, the attorney concluded that appellee was the victim of undue influence.
Later, as appellants’ witness, the deputy chancery clerk, testified that on the day of the execution of the deed, attorney Williams and appellee came to the chancery clerk’s office inquiring for the Chancery Clerk Robbins, who was not in, and Williams asked for her, the witness. They were back in Mr. Robbins’ office, and asked her to take appellee’s acknowledgement to the deed. In doing so, Williams went over the deed with appellee in her presence, and asked him if that was what he wanted to do and receiving an affirmative reply, they asked her to take the acknowledgement which she did, he signed in her presence, and appellee paid her fee for recording it and left it with her.
Lester Sellers, appellants’ witness, had known appellee for some twelve years and visited him at frequent intervals, saying “because we was good buddies.” He saw appellee about every day after appellee’s last wife died. Appellee discussed his finances with the witness, and one day said, “I’ve made up my mind to deed my property and stuff to Lige, my brother, and Donald.” After a few days, he told the witness, “I’ve done it. I got in touch with Donald and he came down and I done it.” In those days, he talked with good sense, “just as bright as I was or anybody else around there.”
Mrs. Oneta Odom Wheat, a witness for appellants, is the daughter of appellee’s first wife’s sister, and had known appellee all her life. She testified to intervisiting with appellee and his wife before her death, that during that time he was driving, had hearing and sight problems and difficulty in breathing. From the last of August 1976 she resided with appellee to October 2,1976, when she broke her foot and could no longer do the things for him she was there to do. He discussed with her his money and land and one day told her, “I have got my money back from Bogalusa and I have got it straightened out.” She asked if it was to his satisfaction, and he said it was. “I put part of it in one bank, part of it in the other bank.” She asked if he fixed it like he wanted it done, and he said, “I did.” Particulars were not told her and she did not ask for explanation. As to the land, she said he wanted it to stay in the Glover name. She asked, “Well, have you made up your mind?” He said, “Yes, I have.” Later he came back and said, “I have got it all settled.” She asked if it was settled the way he wanted it, and he said, “Yes, I did.” At a later time while she was residing with him, he told her that he had left the land to appellants E. E. Glover and Donald Glover. When the discussion took place, she said there was no pressure, there were present just the two of them, just sitting on the porch talking. Donald paid her some money for expenses while she was staying with appellee.
The record reflects in addition to the two suits merged into this one, activities on the part of appellee which are cited by appellants as evidence of appellee’s alertness and business mentality.
About May 1976 he sold a number of cattle and put substantial proceeds therefrom in the Bank of Commerce.
June 9, 1976, he transferred money from the Bogalusa bank to Poplarville, on attorney Williams’ advice.
August 30, 1976, he petitioned for and was granted letters of administration on the estate of his deceased wife, and executed various related documents in doing so, with Mr. Williams as his solicitor.
August 31, 1976, the deed herein was executed by him.
In October 1976 he gave appellant Mrs. Elizabeth Glover authority to write checks on his account.
On November 17, 1976, he executed a power of attorney to Paul McClendon.
*175 On November 19, 1976, he executed power of attorney to Paul McClendon and his wife.
On November 22, 1976, he and Paul McClendon, his attorney in fact, executed a timber deed.
March 18,1977, he executed final account on his deceased wife’s estate.
As earlier noticed, this suit is one based upon confidential relations, asserting appel-lee as the weak subservient party and the adult appellants as the dominant parties in which position they exercised undue influence in pauperizing him.
Various legal principles are involved in these issues.
In Tipton v. Saulsberry, 223 Miss. 763, 78 So.2d 893 (1955), it is said:
Where the relationship of the parties is such as to make a gift a natural act, the courts look with more favor on it where the weight of the evidence is involved than would be necessary to sustain a gift to a stranger. 38 C.J.S. Gifts, pp. 882-883.
(223 Miss. at 769, 78 So.2d at 894).
The relationship of the brothers Glover was one of mutual cooperation, work, and sharing of income until the mid-1960’s when appellant E. E. Glover became disabled to a wheelchair because of rheumatoid arthritis, and thereafter until the October 1976 hospitalization of appellee, they were in each other’s company very frequently sharing meals together and evidencing the close and cordial relationship that should attend the brother status. Appellant Donald was partially reared in ap-pellee’s home and their unquestioned feeling toward each other was as father and son. One is led to inquire as to what status might exist which would make the transactions here complained of more natural. The unchallenged desire of appellee that the land remain in the Glover name adds weight to the land transaction wherein ap-pellee conveyed the property to appellants E. E. Glover and Donald Glover as “joint tenants with full right of survivorship, and not as tenants in common.”
Daren v. Woodward, 204 So.2d 873 (Miss.1967), was a suit for the cancellation of four deeds and three options executed by appellant’s ward. The suit for cancellation was based on a claimed fiduciary or confidential relationship between the ward and the ap-pellees, great weakness of mind of the ward at the time of the transactions, inadequacy of consideration, and other grounds. The time space was begun after April 1, 1964, and extended to August 7,1965. In upholding the chancellor’s finding that confidential or fiduciary relations did not exist, this Court said:
It was not claimed by complainant that Mrs. Drumm was non compos mentis at any time. The sole complaint was that she was weak of mind. The evidence as to this was conflicting, and, as a matter of fact, it was shown that Mrs. Drumm transacted other business affairs and made other sales during this same period of time. No attack was made on these other transactions. Some of the witnesses who had made transactions during this period of time testified that she had a weakness of mind, a tendency toward forgetfulness; but when asked about the state of her mind at the times they dealt with her, which were also during the time of the dealings of the appellees with her, they stated that the mind at those times was perfectly all right. She retained the minerals under the land, had surveys made, had deeds prepared and apparently in each instance selected the officer before whom they were acknowledged. She kept records of each collection and expenditure until just shortly before the end of the year 1965.
(204 So.2d at 874-875).
Two doctors expressed their views in written form in that ease. One, who examined the ward on January 13, 1966, after these transactions, stated that he found “a generalized and cerebral arterial sclerosis,” and expressed opinion that, at that examination, she was incapable of managing her own estate. The other physician stated, in a letter dated January 13, 1966, that “for the past several months, her mental condi *176 tion had been deteriorating.” (204 So.2d 875).
The record here shows transactions before, during and after the July 1, 1976, funds transaction, and the August 31, 1976, land deed transaction, at which time attorney Williams concluded appellee was lucid.
It is to be remembered that appellant E. E. Glover called Mr. Williams about the deed’s contents, and expressed the desire that the deed have the survivorship clause and reserve a life estate in the grantor, and that the deed, written, acknowledged, filed, and recorded, all after private conference with Mr. Williams, had, in addition, reservation of minerals with right of ingress and egress to exploit them, and the right to cut and remove or sell timber, wood, and gravel thereon, and thereunder.
In a long line of decisions from Ham v. Ham, 146 Miss. 161, 110 So. 583 (1926), this Court, in varying phraseology, has defined confidential or fiduciary relation as being one in which confidence is reposed by one and the influence which naturally grows out of such confidence is possessed by the other. See Wofford v. Wofford, 244 Miss. 442, 456, 142 So.2d 188, 194 (1962).
In Farish v. Slaughter, 262 So.2d 182 (Miss.1972), appellants, complainants below, heirs of Eliza Farish Dillard, attacked a deed made by her to her sister the appellee. We said, in part:
The chancellor was likewise correct in finding that the appellee did not exert undue influence upon her sister, the deceased grantor. Since Anna Farish Slaughter was not the dominant force in obtaining the warranty deed and was not in a position of trust and confidence, there is no presumption of undue influence.
(262 So.2d 183).
In Thomas v. Jolly, 251 Miss. 448, 170 So.2d 16 (1964), it was said that:
A deed from a parent to a child alone and of itself raises no presumption of undue influence since, in the absence of evidence to the contrary, the parent is presumably the dominant party. This is true even though the parent is aged, or aged and infirm. Circumstances may show, however, such a confidential relationship in which the child is the dominant party that a presumption of undue influence arises, 16 Am.Jur., Deeds, section 393 (1938).
(251 Miss, at 454, 455, 170 So.2d at 19).
Burnett v. Smith, 93 Miss. 566, 47 So. 117 (1908), involved facts in which the grantor, deceased at the time of the trial, had executed a deed to his youngest child, a daughter, who had remained with him during her life. This deed was attacked on allegations that Mr. Hartzog, the grantor, was mentally incapable of making the deed and was induced by undue influence to make it. In upholding the chancellor’s finding in favor of the validity of the deed, the Supreme Court said:
The procedure of Mr. Hartzog seems to have been with the utmost deliberation. He sent for a gentleman to prepare the deed, and he did prepare it, and Mr. Hart-zog signed the deed; his daughter, Mrs. Smith, who was his youngest child, not being present. He himself went before the officer and acknowledged it. He himself took it to a store where he traded, and caused it to be sent to the office of the chancery clerk to be recorded. After it was recorded he had it returned to him and delivered it to Mrs. Smith.

There could have been no undue influence, unless it was such as to take away the free agency of Mr. Hartzog, and the chancellor found that such was not the case. It must be kept in mind that capacity to make the deed is implied until overthrown by evidence, and we see by reference to 29 Ency. p. 105, that not every influence is undue, and undue influence cannot be predicated of any act unless free agency is destroyed, and that influence exerted “by means of advice, arguments, persuasions, solicitation, suggestion, or entreaty is not undue, unless it be so importunate and persistent, or otherwise so operate, as to subdue and subordinate the will and take away its free agency. Nor is influence ordinarily considered undue which arises out of sympa
*177
thy, kindness, attention, attachment or affection, gratitude for past services, desire of gratifying the wishes of another or of relieving distress, claims of kindred and family or other intimate personal relations, love, esteem, social relations, prejudices or flattery.”

We look in vain in this record for any satisfactory evidence of the exercise of undue influence. We refer, also, to 8 Words and Phrases, commencing on page 7166, for definitions of and authorities on “undue influence;” and we find nothing in this record of sufficient moment to authorize a reversal of the chancellor’s conclusions on the facts of this case. A man of sound mind may execute a will or a deed from any sort of motive satisfactory to him, whether that motive be love, affection, gratitude, partiality, prejudice, or even a whim or caprice. Under the circumstances of this case, it occurs to us as quite natural that Mr. Hartzog should prefer his youngest child, a daughter who had always been with him, and the mere fact that there was no recognition in the deed of his other children, who were of middle age and settled in life, could not be held to be a presumption of undue influence or a lack of free agency. No expert testimony as to sanity was offered. All the witnesses knew the man. Wood v. State, 58 Miss. 741; Sheehan v. Kearney, 82 Miss. 688, 21 South. 41, 35 L.R.A. 102. (Emphasis added).
(93 Miss, at 571-572, 47 So. at 118).
See Ward v. Ward, 203 Miss. 32, 33 So.2d 294 (1948), wherein Justice Alexander, with his wonderful authority and use of words, dealt with an issue of lack of testamentary capacity, and said, in part:
However, this testimony fails to establish the fact that at the crucial moment when evidence of testamentary capacity attains its maximum and controlling relevancy, that is, at the time of the will’s execution, there was any lack of capacity to appreciate the nature and effect of his act and the natural objects of his bounty.
(203 Miss. at 38, 33 So.2d at 295).
Although this decision involved testamentary capacity, it is good authority on the issue now being considered.
Jones v. Singley, 242 So.2d 430 (Miss.1970), involved a suit for cancellation of a deed and other relief, on allegations by complainant-appellant that, occupying a position of trust with her, defendant-appellee defrauded her in the activities as to which she sought relief. In affirming the lower court’s decree dismissing the bill of complaint, we said:
The testimony of Mr. Dickerson and the nurse corroborates that of Mangum. There is no evidence whatsoever to indicate the defendant sought or in any way suggested the opening of this joint account. In fact, the evidence reflects that the complainant was the dominant and moving factor in having this instrument prepared. These witnesses were not interested in the bank account. The testimony of Mr. Mangum was responsive to the complainant’s questions and was devoted to carrying out her interests, both as a banker and a friend of many years. Under these circumstances, the chancellor found that the joint ownership account was established as the complainant desired and requested it to be. He noted from her demeanor and testimony that she was a strong-willed person, not easily persuaded, and that this agreement was knowledgeably made after discussion with a disinterested person competent to advise on the subject. We have reached the conclusion that the presumption of invalidity was rebutted by the evidence; Hall v. Clements, 214 Miss. 445, 58 So.2d 925 (1942); and surely we cannot state that the chancellor was manifestly wrong even though he did not mention the confidential relationship.

******

The next assignment of error is that the court erred in not cancelling the deed executed by the complainant to the defendant. Assuming, as we do, that the confidential and fiduciary relationship was in existence at the time of its execution, we are of the opinion that there was *178 ample advice of a competent person disconnected from the grantee and devoted to the interests of the grantor to overcome the presumption of invalidity. At the time of the execution of the deed there was present an able and honorable member of the bar who had prepared the deed pursuant to the complainant’s previous request, as well as a will. There were also present Mr. Mangum, a bank official, and long friend of the family, a doctor who testified as to the grantor’s mental alertness, and a notary public who acknowledged the instrument. Their testimony was that the deed and other instruments were read to the complainant and that she was mentally alert and competent to transact business. As a matter of fact, their testimony was in agreement to the effect that the complainant directed changes to be made in the will as it was not drawn in some particular as she had previously directed. We think this indicative of an understanding mind and memory at the time. Additionally, their testimony was that the complainant directed her attorney to prepare a general power of attorney designating the defendant to be her agent and that the same was then dictated in her presence and with her understanding. The notary who had taken the dictation testified that the power of attorney was typed the following day by her and subsequently executed by the complainant, again indicating, we think, the competency of the complainant. The chancellor found from this evidence that the complainant had the mental capacity to do that which she had done.
* * * He * *
It is our conclusion that an opinion of the chancellor to the contrary would have been the equivalent of stating that once a confidential relationship comes into existence, the resulting presumption of invalidity of business transactions within the relationship cannot be overcome by clear and preponderating evidence with the distinct possibility that justice flowing from truth would thereby be thwarted. We, therefore, affirm the chancellor in his refusal to cancel the deed. (Emphasis added).
(242 So.2d at 436-437).
At first blush, it might be believed that appellants did take advantage of appellee and take from him, by undue influence premised on confidential relationship, his land and his “life’s savings”. On examination, however, it is found and to be borne in mind that nobody testified that, at the time when evidence of these things reached its highest relevancy, on July 1 and August 31, 1976, appellee did not have possession and control of his free agency, but rather the overwhelming weight of the testimony was that he controlled the content and execution of the deed on August 31, 1976, and, in the “life savings”, he expected the returns for his lifetime, and as to his home, gave up nothing except that which would remain at his death. Thus, he was not by conniving relatives, reduced in two months to the status of a pauper.
We experience great reluctance in reversing a trier of fact on factual questions, as evidenced by our many decisions, but do not hesitate to do so when the decision is contrary to the great weight of the evidence, as we find to be true in this instance.
We reverse and enter judgment here for appellants.
REVERSED AND JUDGMENT HERE FOR APPELLANTS.
PATTERSON, C. J., SMITH, ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE and BOWLING, JJ., concur.