752 So.2d 1078 (1999)
In the Matter of the CONSERVATORSHIP OF Clarence W. McGOWEN, Sr.
James Clayton Gardner, Sr., Appellant,
v.
Anne B. McGowen, Vera Lea McGowen, Clarence W. McGowen Jr., Elizabeth Ann McGowen Bond, Rita Kay McGowen Diaz, Myrna Jo McGowen Franklin, and Kecia McGowen Perkins, Appellees.
No. 97-CA-00457-COA.
Court of Appeals of Mississippi.
September 7, 1999.
Rehearing Denied November 16, 1999.
Certiorari Denied February 17, 2000.
*1079 Gary L. Roberts, Attorney for Appellant.
W. Lee Watt, R. Bradley Prewitt, Pascagoula, Attorneys for Appellant.
BEFORE KING, P.J., BRIDGES, AND LEE, JJ.
KING, P.J., for the Court:
¶ 1. This case originated with a complaint filed in the Chancery Court of Jackson County by J.C. Gardner, on behalf of Clarence Winslow McGowen, alleging that eleven warranty deeds executed by McGowen were obtained through "deceit, trickery or subterfuge" and without McGowen's knowledge. The complaint named as defendants five of McGowen's children and the notary public who notarized McGowen's signature on the deeds. After the defendants executed quitclaim deeds to McGowen, who executed a second set of warranty deeds again naming his children as grantees, Gardner asserted that McGowen was incompetent and petitioned the chancery court to appoint a conservator for him. The cases were consolidated for trial, and the court appointed a guardian ad litem to protect the interests of McGowen. Following a trial on the issue the chancellor ruled that McGowen was competent when he executed the deeds and refused to declare the deeds void.
¶ 2. On appeal, Gardner presents the following assertions of error, which we quote verbatim:

*1080 THE TRIAL COURT EMPLOYED AN INCORRECT LEGAL STANDARD IN ADDRESSING THE ISSUE OF UNDUE INFLUENCE BY A FIDUCIARY. MOREOVER, THE TRIAL COURT WAS MANIFESTLY IN ERROR AND ABUSED ITS DISCRETION IN DETERMINING THAT CLARENCE MCGOWEN WAS COMPETENT WHEN THE DEEDS AT ISSUE WERE EXECUTED AND DELIVERED.
Finding no error, we affirm the judgment of the chancery court.

FACTS
¶ 3. Anne B. McGowen and her husband, Clarence, were married for over fifty years, had six children, and owned thirteen tracts of real property in Jackson County, Mississippi. Anne, aware that she was dying of cancer, discussed the possible disposition of certain property with her husband. In July 1995, the McGowens had their attorney, Eddie Clark Williams, prepare eleven (11) warranty deeds, leaving a blank for the name of each grantee. Both Anne and Clarence McGowen were named as grantors on each of the eleven deeds.[1]
¶ 4. In August of 1995, at Anne's request, their daughter Kecia brought a coworker, notary public Susan Ladnier, to the McGowens' home. Ladnier notarized the deeds as the McGowens signed them, but the spaces for the grantees' names remained blank. During the 1995 Christmas holidays, the McGowens' son, C.W., visited from his home in California. As his parents instructed him which of their children would receive each piece of property, C.W. wrote the name of the specified grantee in the blank on the deed. Because Anne planned to undergo surgery in early January 1996, she asked C.W. to file the warranty deeds with the chancery clerk of Jackson County. In March of 1996, Anne delivered the executed deeds by mail with a handwritten letter to each child.
¶ 5. J.C. Gardner, a Pascagoula attorney, who was formerly married to the McGowens' daughter, Vera Lea, noticed that the warranty deeds had been filed. When he questioned Clarence McGowen about the conveyances, Clarence said that he did not remember signing any warranty deeds. Gardner represented Clarence in the initial complaint to set aside the eleven warranty deeds which granted various parcels of real property to each of Clarence's six children. Gardner filed the action on March 25, 1996, asserting that the defendants, who included all of Anne and Clarence's children except Vera Lea, obtained the warranty deeds "by an act of deceit, trickery, or subterfuge and without [Clarence's] knowledge and consent." The defendants included Elizabeth Ann McGowen Bond, Myrna Jo McGowen Franklin, Rita Kay (Kay) McGowen Diaz, Clarence Winslow (C.W.) McGowen, Jr., and Kecia McGowen Perkins, and the notary public, Susan Gay Ladnier. Gardner later amended the complaint to allege undue influence by "certain of [defendants]," to assert that Anne McGowen had insufficient mental capacity due to her physical condition and possible medication, and to add Vera Lea as a defendant.
¶ 6. In response to the lawsuit, four of the defendants executed quitclaim deeds conveying the property back to Anne and Clarence McGowen as joint tenants with right of survivorship.[2] Eddie Clark Williams drafted eleven new warranty deeds for Anne and Clarence McGowen, each reserving a life estate, with the grantees' names included in the completed documents. Williams had drafted Anne's will in 1993, and the devises of the real property *1081 in the will were consistent with the conveyances specified in the first set of deeds and in this second set of warranty deeds.
¶ 7. Due to her deteriorating health, Anne was living with her daughter, Kay Diaz, while Clarence remained at home. On May 2, 1996, Anne called Mike Byrd, a friend of the family and police captain in Gautier, to inquire about getting the second set of warranty deeds notarized. Kay and Kecia drove Anne and Clarence to Byrd's office at City Hall in Gautier, where the McGowens signed the deeds and had them notarized by Shannon Aguilar. Kay and Kecia were not present when the deeds were signed, but Anne's friend Jane Fields and Mike Byrd witnessed the signatures. Fields and Byrd both testified that Clarence seemed to understand what was taking place and did not seem incompetent. Aguilar testified that Clarence repeated the same joke several times.
¶ 8. On May 17, 1996, attorney Joe White met with Anne and Clarence to review power of attorney documents which White prepared at Anne's request. Anne and Clarence signed the powers of attorney, appointing Kay and Kecia as their respective attorneys-in-fact. White testified that both Anne and Clarence appeared to know what they were doing and that he observed no indication of undue influence by anyone.
¶ 9. Gardner filed a "Petition to Establish Conservatorship and Appointment of Conservator" for Clarence McGowen on July 22, 1996. Only Anne and Vera Lea were named as defendants. Myrna Jo, Kay, C.W., and Kecia filed a "Motion for Joinder and for Authority to File a Response on Behalf of Interested Parties." Gardner filed a motion to strike that motion. Attorney Richard Hamilton filed a response to the petition on behalf of Clarence on July 31, 1996. A special chancellor was appointed to hear this case. The court appointed John Kinard as Clarence's guardian ad litem. Pursuant to an agreed order, Susan Ladnier was dismissed from the suit.
¶ 10. Prior to testimony, the parties stipulated that a conservator should be appointed, and the court appointed Mike Byrd. Therefore, the only issue before the court was whether to set aside the deeds. The chancellor determined that the plaintiff failed to carry its legal burden of proving that Clarence was incompetent at the time that the deeds were executed. Thus, the court declined to set aside the deeds. The subsequent motion for reconsideration was overruled.

DISCUSSION

I. Was the trial court manifestly in error in determining that Clarence McGowen was competent when the deeds at issue were executed and delivered?

A. Legal Standard
¶ 11. The established standard of review requires that "[w]henever there is substantial evidence in the record to support the chancellor's findings of fact, those findings must be affirmed." Denson v. George, 642 So.2d 909, 913 (Miss.1994). The supreme court has clarified that substantial evidence is "more than a `mere scintilla'" and may be characterized as "such relevant evidence as reasonable minds might accept as adequate to support a conclusion." Delta CMI v. Speck, 586 So.2d 768, 773 (Miss.1991). In assessing conflicting evidence, the trial judge sitting as the trier of facts retains sole authority to determine the credibility of the witnesses. Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss.1987). Therefore, the reviewing court will not disturb the chancellor's findings of fact unless they are "manifestly wrong or clearly erroneous." Denson, 642 So.2d at 913; see Leggett v. Graham, 218 So.2d 892, 895 (Miss. 1969).
¶ 12. With respect to cases in which competency is an issue, "[t]he same capacity is required to execute a valid deed *1082 as is required for making a will." Whitworth v. Kines, 604 So.2d 225, 228 (Miss. 1992). A plaintiff asserting lack of capacity to execute a deed bears the burden of proving lack of capacity by clear and convincing evidence. Mullins, 515 So.2d at 1190. Moreover, the grantor's mental capacity must be evaluated as of the specific time that the grantor executed the deed rather than in regard to the grantor's general physical or mental condition. In re Estate of Mask, 703 So.2d 852 (¶ 17) (Miss. 1997); Whitworth, 604 So.2d at 228; Richardson v. Langley, 426 So.2d 780, 783 (Miss.1983). Mississippi courts recognize that, in spite of a general mental condition, a grantor may experience a lucid interval during which the grantor is competent to execute a deed. Whitworth, 604 So.2d at 229.

B. Analysis
¶ 13. The record reveals conflicting testimony as to Clarence's competency at the time that the deeds were executed. The plaintiff adduced testimony from Dr. Roy W. Deal, a psychiatrist, that Clarence was "likely" incompetent one year prior to Dr. Deal's examination on June 12, 1996. However, Dr. Deal acknowledged that this assertion was speculative because he was not actually present to observe Clarence at the time in question. Dr. John A. Stoudenmire, a psychologist, met with Clarence on August 4 and August 12, 1996, and conducted tests to determine Clarence's intellectual, academic, and mental abilities. Dr. Stoudenmire, who testified at the request of the plaintiff, felt confident that Clarence's poor memory condition existed in May of 1996 when the second set of deeds was executed. However, he refrained from postulating as to whether Clarence was competent in May of 1995 when the first deeds were executed. Both Dr. Deal and Dr. Stoudenmire found Clarence's memory problems consistent with Alzheimer's dementia.
¶ 14. In response to Dr. Stoudenmire's testimony about Clarence's poor results on the mental examinations, Myrna Jo McGowen Franklin testified that Dr. Stoudenmire did not take Clarence's extremely poor eyesight and significant hearing loss into account. She acknowledged that Clarence was probably no longer competent at the time of the trial, but maintained that he intentionally transferred the property so that the grantees would pay the taxes. The defense also submitted the deposition of Dr. Henry A. Maggio, who opined that Clarence could have been competent when the deeds were executed. However, the chancellor noted at the hearing on the motion to reconsider that he "took [Dr. Maggio's testimony] with a grain of salt since he had not visited Mr. McGowen" and that he gleaned only general information on Alzheimer's from Dr. Maggio's report.
¶ 15. J.C. Gardner testified that he heard that the McGowens had transferred some property, and that he did not recognize the handwriting on the deeds where the grantees' names were written. He said that Clarence had previously told him that he did not want to transfer the property to his children even though the children were pressuring him to convey title to them in return for their paying the taxes on the land. Gardner concluded that C.W. completed the warranty deeds and that Clarence had been tricked into signing them. He said that Clarence asked him to help get the land back. He also alleged that the quitclaim deeds and the second set of warranty deeds were prepared and executed without Vera Lea's and Elizabeth Ann's knowledge because Vera Lea and Elizabeth Ann did not participate in what Gardner characterized as the "deal to trick Mr. McGowen out of his property."
¶ 16. For the defense, attorney Joe White testified that he met with Anne and Clarence when he prepared powers of attorney for them in May of 1996. He said that he read the documents to Clarence because Clarence did not have his glasses and that there was "no indication that [Clarence] didn't understand" when they *1083 discussed the documents. White stated that he had no doubt that Clarence wanted Kecia to be his attorney-in-fact when the powers of attorney were executed.
¶ 17. Mike Byrd testified that Clarence seemed to understand what he was doing at the time that the second set of warranty deeds was executed on May 2, 1996. Jane Fields, who also witnessed the execution of the deeds, testified that there was nothing unusual about Clarence's behavior and that there was no suggestion that he did not understand that he was signing deeds conveying his property to his children. Shannon Aguilar, who notarized the second set of deeds as Anne and Clarence signed them, stated Clarence seemed fine except that he kept repeating himself.
¶ 18. Eddie Williams described Clarence as "somewhat mercurial" with a "selective memory" and explained that Clarence had a tendency to repeat stories and conversations before he suffered his recent memory problems. Mike Byrd also noted that frequently repeating the same jokes or stories was just a characteristic of Clarence's personality. Witnesses testified that Clarence frequently complained about taxes and that he worried about how he would pay the taxes on his property. Conveying the property to his children, the defense asserted, provided a solution to that problem because the grantees could pay the taxes and use the income from the property to support Clarence.
¶ 19. In its judgment, the court noted that, "even with Alzheimers and poor memory," Clarence could have understood the effect of executing the deeds "at the very moment he signed the deeds." The chancellor sitting as a finder of fact, recognized the opposing interests in this family conflict and assessed the evidence in light of those interests. He was not manifestly in error in finding that Gardner did not meet the burden of proving by clear and convincing evidence that Clarence was incompetent at the time the deeds were executed. The trial court did not abuse its discretion in finding that Clarence was competent and understood the nature of his acts when he conveyed the property to his children. Therefore, we affirm the trial court's conclusion as to this issue.

II. Did the trial court employ an incorrect legal standard in addressing the issue of undue influence by a fiduciary?
¶ 20. Gardner asserts that at least two of the McGowens' children, C.W. and Kecia, had a fiduciary relationship with their parents. Gardner claims that C.W. acted in a fiduciary role by filling in the grantees' names on the deeds. Pursuant to the powers of attorney, Kecia and Kay were attorneys-in-fact for Clarence and Anne McGowen. Gardner notes that Kecia cooked for her father, washed his clothes, cleaned his house, shopped for his supplies, and paid his bills from his checking account. He submits that these tasks, along with the fact that Kecia was a joint signator on her father's checking account, established a fiduciary relationship between Kecia and Clarence.

A. Legal Standard
¶ 21. A fiduciary relationship exists where "confidence was reposed by one, and the influence which naturally grows out of such confidence was possessed by the other." Miner v. Bertasi, 530 So.2d 168, 170 (Miss.1988), (citing Wofford v. Wofford, 244 Miss. 442, 456, 142 So.2d 188, 194 (1962)). The relationship or the duties involved may be "moral, social, domestic, or merely personal" rather than "legal" duties. Mansell v. Gross, 345 So.2d 1315, 1317 (Miss.1977).
¶ 22. The significance of this alleged fiduciary role pertains to the burden of proof. In asserting lack of capacity to execute a deed, the plaintiffs burden requires proving the lack of capacity by clear and convincing evidence. Mullins v. Ratcliff, 515 So.2d 1183, 1190 (Miss.1987). However, if a fiduciary relationship exists between the grantor and the grantee, the grantee must overcome a presumption of undue influence by clear and convincing *1084 evidence. Griffin v. Armana, 687 So.2d 1188, 1193 (Miss.1996); Vega v. Estate of Mullen, 583 So.2d 1259, 1263 (Miss.1991); See Norris v. Norris, 498 So.2d 809, 813 (Miss.1986).
¶ 23. As the trial judge noted, the supreme court has specifically addressed intra-family transfers by stating, "A deed from a parent to a child alone and of itself raises no presumption of undue influence since, in the absence of evidence to the contrary, the parent is presumably the dominant party. This is true even though the parent is aged, or aged and infirm." Anderson v. Burt, 507 So.2d 32, 36 (Miss. 1987), (citing Thomas v. Jolly, 251 Miss. 448, 454-5, 170 So.2d 16, 19 (1964)). The Anderson court further opined:
Common experience teaches that gifts frequently occur between family members, and where a parent has voluntarily given a part of his property to a child we do not interfere, Moore v. Stone, 208 So.2d 585, 586-87 (Miss.1968); see also Glover v. Glover, 367 So.2d 167, 175-78 (Miss.1979) even when a confidential relationship is shown, Leggett v. Graham, 218 So.2d 892, 895 (Miss.1969).
Anderson v. Burt, 507 So.2d 32, 36 (Miss. 1987).

B. Analysis
¶ 24. In the present case, the trial court determined that none of the children exercised undue influence over Clarence. In supporting its decision, the lower court explained that it was "compelled to believe Anne" in weighing the credibility of the various witnesses. In her deposition, Anne testified that she and Clarence instructed C.W. to write the grantees' names in the blanks on the first set of deeds. She stated that the children had agreed to pay the taxes on their parents' property even if the property were not conveyed to them. She explained that the grantees' names were blank because she was trying to decide about which property to convey to Vera Lea, who wanted property that the McGowens planned to convey to someone else.[3] In addition to Anne's testimony, the letters from Anne which accompanied the deeds to her children reflected that she and Clarence agreed on the disposition of each parcel of property.
¶ 25. Attorney Eddie Clark Williams testified that Anne told him that she and Clarence had discussed the disposition of their property, that together they decided how to distribute the various parcels, and that Clarence agreed to execute the deeds. He noted that the children asked him to prepare the quitclaim deeds by which they transferred the property back to Clarence and Anne. He asserted that he observed no indication that either Anne or Clarence would try to overreach each other in making the decisions about conveying the property.
¶ 26. Mike Byrd testified that Clarence did not seem to be influenced by any of the children when he signed the second set of warranty deeds. He observed that Kay and Kecia drove their parents to his office, but remained outside the room while the second set of warranty deeds was executed. Jane Fields witnessed the execution of the deeds and testified that Clarence seemed to know what he was doing and was not improperly induced to sign the deeds.
¶ 27. Kecia and Myrna Jo testified that they were present when the grantees' names were added to the first set of deeds and that C.W., rather than influencing his parents' decisions, simply followed his parents' instructions for filling in the names of the grantees. Kecia explained that the initial deed conveying the McGowens' home to her reserved a life estate for Anne and Clarence because they did not want to lose their homestead exemption for tax purposes. Attorney John Kinard, Clarence's guardian ad litem, testified that he did not perceive any clandestine motive on the part of the defendants; rather, the *1085 McGowens' children believed that their parents intentionally conveyed the property to them.
¶ 28. The record includes evidence which the lower court found credible enough to rebut any presumption of undue influence by the defendants. Thus, the trial court found that the plaintiff failed to prove undue influence over Clarence by the children. The court further determined that if anyone exercised influence over Clarence's decisions about the deeds it was Anne, who was not a grantee.
¶ 29. Where a presumption of fraud or undue influence exists, that presumption may be overcome "by showing the facts and circumstances surrounding the case, the consideration involved, the relationship of the parties, mental condition of the grantor at the time of the conveyance, and the degree of independence exhibited by the grantor." Leggett v. Graham, 218 So.2d 892, 895 (Miss.1969); see Vega v. Estate of Mullen, 583 So.2d 1259 (Miss.1991). Anne's 1993 will indicated her wishes and mirrored the deeds executed for the disposition of the property in question. The trial court assumed that Clarence was aware of Anne's will and noted that any influence that Anne exercised over Clarence resulted from the fiftyfive year duration of the marriage. Based upon the facts and circumstances surrounding the case and the relationship of the parties, the trial court refused to find that Anne exercised "undue" influence in regard to Clarence's signing the deeds or that Clarence did not independently elect to convey the property based upon Anne's recommendations.
¶ 30. The testimony from Anne's deposition, as well as the testimony of the witnesses at trial supports the chancellor's conclusion, and we find no indication that an improper standard was applied. Therefore, we affirm the judgment of the chancery court.
¶ 31. THE JUDGMENT OF THE CHANCERY COURT OF JACKSON COUNTY DENYING THE APPELLANT'S ACTION TO SET ASIDE THE DEEDS AND APPOINTING A CONSERVATOR FOR CLARENCE MCGOWEN IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANT.
McMILLIN, C.J., SOUTHWICK, P.J., BRIDGES, DIAZ, LEE, MOORE, PAYNE, AND THOMAS, JJ., CONCUR. IRVING, J., NOT PARTICIPATING.
NOTES
[1] Some of the parcels were jointly owned, while others were owned individually by Anne or Clarence. In her deposition, Anne stated Williams was informed which parcels were owned by each grantor and which parcels were jointly owned. However, Williams prepared the deeds naming both Anne and Clarence as grantors for each parcel.
[2] Vera Lea and Elizabeth Ann did not execute quitclaim deeds.
[3] Attorney Williams testified that Anne told him that she believed that this litigation resuited from Vera Lea's dissatisfaction with the property that her parents gave to her.