586 So.2d 768 (1991)
DELTA CMI and The Insurance Company of Pennsylvania
v.
David E. SPECK.
No. 89-CC-0214.
Supreme Court of Mississippi.
August 28, 1991.
*769 Clifford B. Ammons, Watkins & Eager, Jackson, for appellants.
David O. Butts, Jr., Tupelo, for appellee.
Before DAN M. LEE, P.J., and ROBERTSON and BANKS, JJ.
BANKS, Justice, for the Court:

I
This Workers' Compensation case presents the issue whether apportionment is proper based on evidence that factors other than those related to the job activity immediately in question contributed to the disabling condition where there is no showing of previous occupational disability. Once again we answer, no.
Delta Coatings Manufacturers Inc., (Delta CMI) and the Insurance Company of Pennsylvania appeal from a decision of the Claiborne County Circuit Court reversing an order of the Workers' Compensation Commission (Commission) awarding benefits to David E. Speck (Speck) for permanent total disability. The Commission apportioned the award by fifty percent, attributing one-half of Speck's disability to past occupational exposure to various dust and chemicals and the other half to exposure to chemical irritants while working for Delta CMI. The circuit court reversed the Commission order and awarded all benefits provided pursuant to the statute to Speck, without apportionment. We affirm.

II
On March 9, 1983, Speck filed a "Petition to Controvert" with the Mississippi Workers' Compensation Commission, thus beginning the proceedings leading to this present action. He alleged that on November 10, 1982, he received a compensable injury while in the employ of Delta CMI. Hearings were held pursuant to this petition. His testimony at the hearings revealed the following.
From July 1982 until November of the same year, Speck, then a 42-year-old male with an eleventh grade education, was employed as a painter by Delta CMI, a painting sub-contractor at Grand Gulf Nuclear Power Plant in Port Gibson, Mississippi. Speck painted the steel work at the plant. The type of paint he sprayed was, or contained heavy concentrations of, zinc. Prior to working for Delta CMI, he was in good physical condition and did not have any serious problems with his health. Speck admitted that he worked in autobody repair for 16-17 years and his job entailed sandblasting. He stated, however, that he used the proper equipment when blasting vehicles and was not exposed to any dust and particles. He maintained that he was exposed to some toxic fumes while painting cars, "because there [was] no way to keep from being exposed to some [fumes]." Nevertheless, he testified that he never sprayed zinc before working for Delta CMI. He also acknowledged that he smoked during the twenty years prior to injury in 1982. Specifically, he stated that he smoked between one-third and a pack of cigarettes a day. He also did not experience *770 any health maladies from July of 1982 to November, 1982.
On November 3, 1982, Speck began working near the nuclear reactor. His duties entailed sandblasting, painting, and re-coating zinc in the area surrounding the reactor  an area 45 feet wide, 60-65 feet deep. Though protective equipment was supplied by Delta CMI, there was not enough equipment for the number of workers needed to paint. To compound the lack of protective equipment, Speck recalled that on November 7, the blasters were working erratically.
They would come on when they wanted to and they would go off when they wanted to. I got caught that night, I believe, trying to put on my air hood on, [sic] and it come on, and I blasted about 30 minutes without anything [protection].
During this episode, Speck inhaled zinc dust without a mask. He stated "there wasn't anything you could do but breathe it," and he could not release the blaster "because if it hit you it would fix you up." It was under these conditions that Speck began to experience effects of the chemicals. Between November 7th and 10th, Speck began to feel ill. He stated that during this time, he "had a sweet taste in [his] mouth and bad headaches and hurting between [his] shoulders and ... back around here up [his] neck, and [he'd] go home and ... wrap up, fever and this... ." He also stated that he had no appetite, was suffering from insomnia, and coughed incessantly. On November 10, Speck became seriously ill. Immediately before injury he felt weak, had a headache and a taste of zinc in his mouth. He stated that he just did not feel well. He also felt pains in his chest. He was carried to first aid by one of his co-workers. From there, he was transported to a hospital in Vicksburg, where he spent three days in intensive care. After his stay in Vicksburg, he was taken to a hospital in Jackson.
Speck returned to work on November 29. Approximately five days after his return, Speck was placed back in containment, grinding welds and zinc. While grinding welds, Speck was again exposed to zinc fumes. He continued to work in containment until he again began to suffer with headaches, rigors, fever, and a sweet taste. Eventually, Speck was removed from containment. He was assigned to work in various parts of the building. Occasionally, he missed some days from work due to his injury. He worked on and off from November 29, 1982, until February 1983.
In February of 1983, Speck's supervisor told him to go to a doctor and bring a statement indicating either Speck's ability or inability to work.
Speck complied and in March of 1983, he was examined by Dr. Victor Alexander at Oschner Clinic in New Orleans, Louisiana. Speck underwent three days of testing and examination. Speck has not worked since February of 1983. In describing his physical feelings, he stated that any physical activity tires him and takes his "wind."
Testimony further established that Speck had a long work history. Specifically, from 1958 through 1964, Speck was employed in a furniture factory in Union County, Mississippi, doing upholstery work. As discussed, he worked in autobody repair from 1965 through 1981. In 1980-1981 through July 1982, he worked as a fireproofer for Bechtel Corporation at Grand Gulf Nuclear Power Plant. While with Bechtel, he wore protective gear and sprayed materials containing asbestos and fiberglass. He stated that it was possible that he inhaled some asbestos or fiberglass while working for Bechtel[1]. In June 1982, he worked one week for Crown Coating in Natchez, Mississippi. He resigned because the conditions under which he worked were unsafe.
Also before the lower tribunals were the depositions of Dr. Victor Alexander, director of En Viro Health Systems in New Orleans, Louisiana, and Dr. Jerrold Lee Abraham, physician and pathologist at State University of New York Health Science Center in Syracuse, New York.
Dr. Alexander, occupational medicine specialist, was deposed on January 28, 1985. He examined Speck on March 1, *771 1983, after a medical officer for the National Institute for Occupational Safety and Health (NIOSH) recommended that Speck see Dr. Alexander. Dr. Alexander testified that Speck told him that he had been sandblasting and painting under very adverse environmental exposure conditions while working at Grand Gulf Nuclear Plant. Speck told the doctor that prior to the incident, he experienced fever, chills, and a sweet taste in his mouth with a productive cough, severe shortness of breath, decreased appetite and blood streaked sputum. Speck also gave his previous work history.
Dr. Alexander conducted a physical examination of the claimant and ordered pulmonary function studies, a cardiogram, blood tests, and chest x-rays. A cardiologist consulted by Dr. Alexander reported that Speck had coronary disease. He was unable to opine whether the disease was caused or aggravated by toxic fume exposure. In Speck's case, the findings were typical of, or consistent with previous dust exposure, usually from an occupational environment. Dr. Alexander testified that reduced vital capacity is associated with significant pulmonary dust exposure. He stated that Speck, in his opinion, had underlying coronary artery disease and suffered an "acute cardio-respiratory embarrassment" following overexposure while sandblasting and painting in November of 1982. He further testified that Speck had evidence of recent pulmonary damage in part due to his most recent exposure while working at Grand Gulf and in part to his several years previous occupational exposure to a variety of dusts, including sandblasting, silica exposure, and also spray paint. It was his opinion that the primary cause of the pulmonary damage was occupational exposure over a period of 17 years as a spray painter, with some contribution from smoking, and that the exposure to silica and zinc chromate based paints during a period of two months in 1982 at Grand Gulf played a contributing role in the development and current state of Speck's pulmonary condition. He stated that it would be difficult to attach a specific number to the contribution of each component.
Dr. Abraham's testified that he was first contacted on January 24, 1986, by one of Speck's doctors who asked him to examine the tissue from a lung biopsy performed on Speck. His findings revealed,
that there is evidence of increased dust content in Mr. Speck's lung compared to what you would find in somebody without occupational exposure.
Also found in the lung were great concentrations of
silica, aluminum silicates and metals. In this case, the metals accounted for most of the increased earth or dust in this man's lung; and besides just in general being elevated in concentration, the types of particles found were suggestive of some unusual exposure, and the major types found were titanium and iron.
* * * * * *
The reason I think that these indicate an unusual exposure is that these wouldn't be found just in somebody walking down the street. They signify that this person was really exposed to some source of these materials ... you wouldn't expect to find them in somebody without some occupational exposure.
Dr. Abraham stated that his findings indicated that Speck's injury was one of rapid onset. He stated, "most all of the changes seemed to be of the similar age ... it looks like an injury that occurred over a relatively short period of time such as weeks or months rather than years." In Dr. Abraham's opinion, the biopsy results were "consistent with a chemical dust and fume type of injury, and the analysis confirmed there is exposure to many dusts and fumes."
Cigarette smoking was a minor contributor to Speck's injury, compared to the dust, according to Dr. Abraham. He stated that cigarette smoking is not usually associated with the very uniform appearance of the scars on Speck's lungs, suggesting one exposure period; furthermore, cigarette smoking is usually not associated with the degree of fibrosis found in Speck. The *772 doctor opined that if Speck had received significant exposures to harmful materials between 1965 and 1981, he would have become symptomatic prior to 1981 which led the doctor to conclude "that his more recent exposures which began in 1982 were significant or the major contributor to his problem... ."
Dr. Abraham had access to a NIOSH Health Hazard Evaluation Report[2] which documented excessive levels of dust at Grand Gulf. Accepting as true the information in the report, Dr. Abraham opined that the cause of Speck's restrictive lung disease emanated from occupational exposure. He, however, did not exclude the possibility that performing autobody work could cause the injury Speck sustained.
Dr. Richard Russell was called to testify on behalf of the claimant. Dr. Russell's testimony established that he was a family practitioner in New Albany, Mississippi and was the attending physician for Speck's family. He examined Speck on July 15, 1984, and at that time Speck told the doctor that he had been spraying paint in an area, with nothing to protect him but a paper mask, when he began to experience headaches, rigors, body aches, as well as, problems with his back and lungs. Dr. Russell prescribed medication and continued to see Speck on a monthly basis through October of 1984.
He also thought that the exposure to zinc in November of 1982, could have aggravated Speck's heart condition. He also stated that Speck is totally disabled from any type work that he was qualified to do. He speculated that this disability arose in 1982, and that the exposure in 1982 directly caused the lung disorder.
Another physician, Dr. David Benjamin Moore, was consulted in Speck's case. He stated that he first saw Speck in April of 1984 and again in October of 1985 when he was given a history. Speck told the doctor that he had been exposed to zinc and silica while sandblasting. Dr. Moore conducted a physical examination of and pulmonary function studies on Speck. He diagnosed Speck with restrictive and obstructive lung disease. He testified that he forwarded the lung biopsies to Dr. Jerrold Abraham for an analysis of possible silica content. He further stated that Dr. Abraham's report agreed with his diagnosis of restrictive lung disease induced by chemical dust and fume injury to the lungs. The doctor maintained that Speck's pulmonary disease is primarily due to exposure to various dusts and dust fumes encountered during his previous occupations, including his tenure at Grand Gulf.
The doctor could not apportion the role of exposure at Grand Gulf from work history. He also stated that it is reasonable to assume that Speck's prior work history and exposure is playing some role in his pulmonary disability.
On March 25, 1987, the administrative law judge ordered that Delta CMI pay to Speck permanent and total disability benefits. The Commission apportioned the award by fifty percent. The circuit court, acting pursuant to Miss. Code Ann. § 71-3-51 (1972)[3], reversed the order of the commission, ruling that the apportioned award granted was not supported by substantial evidence and awarded Speck all benefits provided under the act for permanent total disability.

III
Under settled precedent, courts may not hear evidence in compensation cases. Dunn, Mississippi Workmen's Compensation § 272 (1982). Rather, their scope of review is limited to a determination *773 of whether or not the decision of the commission is supported by substantial evidence. If so, the decision of the commission should be upheld. Georgia-Pacific Corp. v. Veal, 484 So.2d 1025 (Miss. 1986). The circuit courts act as intermediate courts of appeal. Dewberry v. Carter, 218 So.2d 27 (Miss. 1969). The Supreme Court, as the circuit courts, acts as a court of review and is prohibited from hearing evidence or otherwise evaluating evidence and determining facts; Dunn, Mississippi Workmen's Compensation § 287 (1982). See also, Bruton v. Mississippi Workmens' Compensation Commission, 253 Miss. 694, 178 So.2d 673 (1965) ("This Court is a court of review and is not a trier of facts ...) and, "while appeals to the Supreme Court are technically from the decision of the Circuit Court, the decision of the commission is that which is actually under review for all practical purposes." Dunn, Mississippi Workmen's Compensation, § 286, n. 39 (1982).
As stated, the substantial evidence rule serves as the basis for appellate review of the commission's order. Indeed, the substantial evidence rule in workers' compensation cases is well established in our law. Olen Burrage Trucking Co. v. Chandler, 475 So.2d 437, 439 (Miss. 1985). Substantial evidence, though not easily defined, means something more than a "mere scintilla" of evidence, Johnson v. Ferguson, 435 So.2d 1191 (Miss. 1983) and that it does not rise to the level of "a preponderance of the evidence." Babcock & Wilcox Co. v. McClain, 149 So.2d 523 (Miss. 1963). It may be said that it "means such relevant evidence as reasonable minds might accept as adequate to support a conclusion. Substantial evidence means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred." State Oil & Gas Bd. v. Mississippi Min. & Roy. Own. Ass'n, 258 So.2d 767 (Miss. 1971). United States v. Harper, 450 F.2d 1032 (5th Cir.1971).

IV
Delta CMI petitions this Court to reinstate the order of the Commission, finding that Speck's pre-existing disease was a material contributing factor in the results following injury, entitling it to apportionment. More to the point, Delta CMI asserts that the legislature intended that apportionment apply to pre-existing physical problems, conditions, and infirmities; they contend that apportionment should not be keyed to pre-existing occupational incapacity.
Delta CMI has misread the intent of Miss. Code Ann. § 71-3-7, the apportionment statute, as well as decisions of this Court interpreting that statutory proviso. In Stuart's, Inc. v. Brown, 543 So.2d 649, 654 (Miss. 1989)[4], we stated in no uncertain terms that "only pre-existing occupational disabilities generate a duty to apportion." Id. (italics in original) Pre-existing, nondisabling conditions aggravating or prolonging compensable injury are not amenable to apportionment. Id. at 654.
In the instant case, the record reflects that prior to November 1982, Speck suffered no pre-existing handicap, disease, or lesion resulting in occupational disability. Thus, the commission erred in apportioning the award. Although Drs. Alexander and Moore were of the opinion Speck had underlying heart and/or lung problems prior to his exposure in 1982, the evidence is uncontradicted that Speck was gainfully and continuously employed from 1965 through 1982.
As with the claimant in Marshall Durbin, Inc. v. Hall, 490 So.2d 877 (Miss. 1986), the record reveals that Speck was employed productively prior to November 1982, as he had been for many years prior, and that as a result of his injury on November 10, 1982, (excessive chemical dust exposure while working for Delta CMI), he is now unable to work.
Delta CMI asks that this Court read the language in the apportionment statute in *774 such a way as to permit apportionment for pre-existing physical problems. It argues that Speck's pre-existing pulmonary problems though asymptomatic, are now resulting in his present total disability. These problems, they stress, resulted from his smoking and his employment previous to Delta CMI.
The interpretation requested by Delta CMI runs contra to the spirit and letter of the Act which favors compensation for injuries resulting from or on-the-job. Miss. Code Ann. § 71-3-7 (1972); General Elec. Co. v. McKinnon, 507 So.2d 363, 365 (Miss. 1987); see also, Ryan Supply Company v. Brett, 222 Miss. 30, 35, 75 So.2d 75, 77 (1954) (the Act should be given a liberal interpretation to effect its salutary purposes). The same contentions were raised by the appellants and supporting Amici in Stuart's. There, the appellants and Amici argued,
that no language in the statute prescribes that the apportionment-requiring, pre-existing condition be one that has occupationally disabled the worker.
Stuart's Inc., 543 So.2d at 653. The Court responded,
This begs the question, as the statutory language similarly fails to decree that such a condition be of a medical or functional nature... . Put otherwise, any Section 71-3-3(i) disability, be it functional or occupational, will have a medical etiology.
Still, candor requires concession that our readings of the apportionment statute have been less than consistent. International Paper Co. v. Tiffee, 246 So.2d 535 (Miss. 1971) is prominent in a line of case which suggests that when an employer demands apportionment we look for a preexisting medical infirmity, not a preexisting occupational disability. But a moment's reflection is required to realize that acceptance of this view puts the Court in the proverbial posture of mixing apples and oranges. For disability purposes our compensation law directs attention to occupational or industrial disability, loss of wage earning capacity, if you will. Yet, for apportionment purposes we are told we must ignore these thoughts and search for a preexisting medical condition and apportion if we find a "contributing" one, wholly without regard to whether that condition had been disabling in an occupational sense. We are told we must apportion, that is, reduce the claimant's (already statutorily apportioned) claim to compensation for her pecuniary losses, if we find a "preexisting physical handicap, disease or lesion," notwithstanding that such in no adverse way affected the employee's wage earning capacity before the accident. What sense does this make, to use a condition that produced no loss of wage earning capacity ex ante as a reason for compensating ex post less than the employee's full work-connected loss of wage earning capacity? How can that which "results" in no inability to work ex ante "result" (in part) in inability to work ex post.

Stuart's, Inc., 543 So.2d at 653. (emphasis in original)
Delta CMI cites a number of cases[5] for the proposition that the legislature intended apportionment to be applicable to pre-existing, disabling physical problems or conditions. We reiterate what we stated in Stuart's, Inc., "to the extent there may be language within the opinions [in these cases] inconsistent with what we say this day, that language stands modified." Stuart's, Inc. v. Brown, 543 So.2d 649, 655 n. 14 (Miss. 1989).

V
Here, Dr. Alexander was of the opinion that Speck's disability arose from a combination of his past employment, including employment between 1965 through 1981, as well as, exposure at Grand Gulf while working for Delta CMI. Dr. Moore also indicated that Speck's pulmonary disease *775 was primarily due to exposure to various dusts and dust fumes encountered most likely during his previous occupations. However, neither of these doctors actually viewed Speck's lung tissue and performed diagnostic tests on the tissue. Dr. Abraham was the only witness of the three doctors testifying on the issue of pre-existing medical conditions to actually view the lung tissue and perform diagnostic tests. It was his opinion that Speck's injury was one of "rapid onset" and that most changes seemed to be of similar age occurring over weeks or months, rather than years. He opined that Speck's exposures in 1982 were the major contributing factor to the lung damage he found. Additionally, Dr. Moore agreed that a specialist such as Dr. Abraham, would be more qualified to quantify how particular exposures might have contributed to Speck's problem.
Assuming without deciding that there is substantial evidence to support the Commission's finding that Speck had a pre-existing condition which accounts for fifty percent of his present disability, the above stated principles dictate that there be no apportionment. The evidence is unrefuted that Speck was both gainfully and continuously employed since 1965 and only since his exposure and injury in 1982, has he been unable to work.
The circuit court order reversing the Commission order, and awarding all benefits provided under the Act for permanent total disability, without apportionment, is affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and McRAE, JJ., concur.
NOTES
[1] The biopsy revealed no traces of asbestos or fiberglass.
[2] On February 2, 1983, NIOSH received a request to evaluate the potential health hazards for painters applying epoxy resins surfacers and zinc chromate paints during final construction of the Grand Gulf Nuclear Power Plant at Port Gibson, MS.
[3] This section reads,

The circuit court shall review all questions of law and of fact. If no prejudicial error be found, the matter shall be affirmed and remanded to the commission for enforcement. If prejudicial error be found, the same shall be reversed and the circuit court shall enter such judgment or award as the commission should have entered.
Miss. Code Ann. § 71-3-51 (1972).
[4] Though this opinion does not address either occupational disease or heart attack cases, and is arguably not applicable to the case at bar, the principles it espouses in relation to apportionment are relevant to Speck's case.
[5] Smith and Sanders, Inc. v. Peery, 473 So.2d 423 (Miss. 1985), General Elec. Co. v. McKinnon, 507 So.2d 363 (Miss. 1987), Delta Drilling Co. v. Cannette, 489 So.2d 1378 (Miss. 1986), Road Maintenance Supply v. Dependants of Maxwell, 493 So.2d 318 (Miss. 1986), International Paper Company v. Tiffee, 246 So.2d 535 (Miss. 1971).