# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CT-00502-SCT

*LONNIE SMITH*

*v.*

*TIPPAH ELECTRIC POWER ASSOCIATION AND
ELECTRIC POWER ASSOCIATIONS OF MISSISSIPPI
WORKERS' COMPENSATION GROUP, INC.*

## ON WRIT OF CERTIORARI

DATE OF JUDGMENT:             03/05/2012
TRIAL JUDGE:                  HON. LILES B. WILLIAMS
COURT FROM WHICH APPEALED:    MISSISSIPPI WORKERS' COMPENSATION
                              COMMISSION
ATTORNEYS FOR APPELLANT:      JOHN S. FARESE
                              ANTHONY L. FARESE
ATTORNEY FOR APPELLEES:       AMY K. TAYLOR
NATURE OF THE CASE:           CIVIL - WORKERS' COMPENSATION
DISPOSITION:                  REVERSED AND REMANDED - 04/03/2014
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     After suffering extensive electrical shock while working as a lineman for Tippah

Electric Power Association ("Tippah"), Lonnie Smith filed a petition to controvert with the

Mississippi Workers' Compensation Commission ("Commission").  Tippah denied that

Smith's claim was compensable and raised the affirmative defense that Smith had

intentionally injured himself.  The administrative judge ("AJ") found that Smith had

intentionally injured himself and that his injury was not compensable; the Commission affirmed the AJ's denial of the claim. The Mississippi Court of Appeals affirmed the Commission's decision.[1] We granted certiorari because we find that the Commission's decision is not supported by substantial evidence. We reverse and remand this case to the Commission for a determination of benefits.

**FACTS AND PROCEDURAL HISTORY**

¶2.    On April 29, 2010, Smith was working as a lineman installing underground electrical service to a residential trailer. Smith was working as the bucket man as part of a crew that included foreman Freddy Crawford, Michael Braddock, and Ronald Stroupe. Part of Smith's duties included disconnecting the clamp on the primary or "hot" electrical line, which he did. After he disconnected the clamp, Smith waited in the bucket for the crew below to finish some work so he could continue with his job. Stroupe and Crawford testified that Smith had been quieter than usual that day and was not joking around as much.

¶3.    As Smith was waiting in the bucket, Tippah engineer Danny Caples drove up to the job site. Caples had been sent by Tippah management to bring Smith in for a drug test. Caples testified that he told Crawford that he needed Smith to come with him and that Crawford told Smith to come down. Caples turned and began to walk away at that point, and does not remember if Smith responded. Crawford also testified that he told Smith to come down. Braddock testified that Crawford told Smith to come down and that Smith responded,

---

[1] ***Smith v. Tippah Elec. Power Ass'n***, ___So. 3d ___ , 2013 WL 2303524 (Miss. Ct. App. May 28, 2013).

"Okay. Let me take the clamp off the transformer." Smith does not remember being told to come down. It is undisputed that Smith was not informed why Caples was there.

¶4. A few seconds after he turned to walk away, Caples heard the bucket moving, followed by a buzzing sound. When he turned around, he observed Smith lying in the power lines, with one hand on the neutral line and one hand on the primary. Caples did not see how Smith came to touch the lines. Likewise, the other crew members present did not see the actual accident, although they all testified that they heard an "arch," or the distinctive sound that an electrical line makes when it discharges current. Crawford testified that, when he looked up, he saw Smith in the lines, with one hand on the neutral and one hand on the primary. Braddock similarly testified that, when he heard the arch, he turned and saw Smith's right hand on the neutral and left hand on the primary, smoke coming out of Smith's left hand, and then saw Smith fall into the bucket. Stroupe testified that, after he heard the noise, he turned and saw Smith lying in the primary wire.

¶5. Smith testified that his memory of what happened is not clear. However, Smith testified that, before the accident, he dropped something, perhaps his knife, inside the bucket. He testified that he bent down to pick up the object, stood up, and came into contact with the primary line. Smith acknowledged that, to be severely injured, a person must be grounded when he contacts the primary line, but he does not know what his ground was, or why his injuries were so severe if he bumped into only the primary line.

¶6. After the accident, the crew brought the bucket and Smith down to the ground. Caples testified that Smith was wearing leather gloves that were burned on the palms. Smith acknowledged that workers were required to wear rubber gloves if they were going to be

3

within two feet and one inch of the primary line, but that he routinely wore leather gloves if the job did not require him to come within that distance. Smith survived the accident, but both of his arms were lost below the elbow.

¶7.    After the accident, Michael Weltzheimer, Tippah's vice president of Safety and Loss Control, conducted an investigation. Welzheirmer testified that the distance between the primary and neutral lines was measured to be around three feet and seven inches. Weltzheimer testified that a perfect distance between the lines would be four feet, but that a difference of three feet and seven inches was not uncommon. Additionally, Caples testified that the distance between the lines might have been around two feet.

¶8.    Smith filed a petition to controvert with the Commission. Tippah denied compensability, arguing that Smith intentionally injured himself. Tippah's theory was that Smith, who was under a criminal investigation and had been acting depressed, panicked when Caples came to bring him in and intentionally grabbed the neutral and primary lines in an attempt to commit suicide. Following a hearing, the AJ found that Smith had intentionally injured himself and determined that his injury was not compensable.

¶9.    Specifically, the AJ found that Smith's version of what happened was not credible, in part because he did not remember how the accident occurred. The AJ noted that Smith testified that he recalled coming into contact with only the primary, which was directly contradicted by the testimony of three other witnesses who saw Smith with one hand on the primary and one hand on the neutral. The AJ also noted that Smith testified he was not told to come down, which contradicted the other testimony that Crawford instructed him to come down. The AJ further noted that Smith was an experienced lineman who knew that he should

4

have been wearing rubber gloves if he was going to be within two feet one inch of the primary line, instead of the leather gloves he was wearing, and that there was testimony that Smith was not acting like his usual self that day. The AJ also noted that there were four feet between the primary and neutral line. The AJ found that, based on the testimony presented, Smith had one hand on the primary line and one hand on the neutral line at the time of the incident and, given the four feet between the lines, that Smith intentionally placed his hands on the neutral and primary lines with full awareness of the potential consequences.

¶10. Smith appealed the AJ's decision to the Commission, which affirmed, with Commissioner Debra Gibbs dissenting. Commissioner Gibbs would have found that the injury was compensable because Tippah failed to meet its burden of proof in establishing that Smith had intentionally injured himself. Specifically, Commissioner Gibbs noted that there was sufficient evidence to contradict Tippah's position that Smith attempted suicide the day of the accident and that no witness actually saw the moment of injury. Commissioner Gibbs further noted that there was conflicting testimony regarding whether Smith heard Crawford call for him to come down, Smith's mood the day of the accident, and the distance between the neutral and primary lines.

¶11. The Court of Appeals found that the Commission's decision was supported by substantial evidence and affirmed. We granted certiorari.

**DISCUSSION**

**I.     Standard of Review**

¶12.    "The standard of review in a workers' compensation appeal is limited to whether the Commission's decision is supported by substantial evidence."[2]   This Court has defined "substantial evidence" as follows:

> [s]ubstantial evidence . . . means something more than a "mere scintilla" of evidence, and that it does not rise to the level of "a preponderance of the evidence." It may be said that it "means such relevant evidence as reasonable minds might accept as adequate to support a conclusion.  Substantial evidence means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred."[3]

"This Court will reverse an order of the Workers' Compensation Commission only where such order is clearly erroneous and contrary to the overwhelming weight of the evidence."[4]

**II.     The Commission's decision was not supported by substantial evidence.**

¶13.    The Mississippi Worker's Compensation Act defines a compensable injury as "an accidental injury . . . arising out of and in the course of employment without regard to fault . . . ."[5] The Act specifically excludes from compensation injuries due to the "willful intention of the employee to injure or kill himself . . . ."[6] When a party raises an affirmative defense, such as Tippah's argument that Smith intentionally injured himself, the burden of proof

---

[2]*Lott v. Hudspeth Center*, 26 So. 3d 1044, 1048 (Miss. 2010) (citation omitted).

[3]*Short v. Wilson Meat House, LLC*, 36 So. 3d 1247, 1251 (Miss. 2010) (citations omitted).

[4]*Lott*, 26 So. 3d at 1048 (citation omitted).

[5]Miss. Code Ann. § 71-3-3(b) (Rev. 2011).

[6]Miss. Code Ann.  § 71-3-7(4) (Supp. 2013).

6

"rests squarely on the shoulders of the one who expects to avoid liability by that defense."[7] In this case, the AJ and Commission found that Tippah had met its burden by presenting evidence that Smith was under investigation for murder, that Smith was not acting as jovial as usual on the day of the accident, that Smith had been asked to come down from the bucket after Caples arrived, that several witnesses had seen Smith with his hands on the primary and neutral lines after the accident occurred, and that Smith could not remember how the accident occurred. However, neither Crawford, Caples, Braddock, nor Stroupe actually witnessed the accident itself, and, thus, there was no direct evidence regarding how Smith came to touch the neutral and primary lines. Furthermore, the fact that Smith cannot remember exactly what happened leading up to his injuries is not evidence that he intentionally grabbed the power lines.

¶14. We find that the AJ's and Commission's decisions are not based on substantial evidence, but rather are based on assumptions and speculation regarding how the accident occurred. These include assumptions that Smith was depressed or suicidal and that Smith believed Caples was at the work site to cause trouble for Smith. These assumptions are not supported by any of the testimony presented. There was simply insufficient evidence to support a finding that Smith intentionally grabbed both the primary and neutral lines in an attempt to commit suicide. The burden of proof was on Tippah to show that Smith intentionally injured himself. Tippah failed to do so. Therefore, we find that the Commission erred in finding that Smith intentionally and willfully injured himself and that

---

[7] *Marshall Durbin Cos. v. Warren*, 633 So. 2d 1006, 1009 (Miss. 1996) (citation omitted).

7

his injuries were not compensable.

## CONCLUSION

¶15.    For the foregoing reasons, we reverse the decisions of the Workers' Compensation Commission and the Court of Appeals and remand this case to the Commission for a determination of benefits.

¶16.    **REVERSED AND REMANDED.**

**WALLER, C.J., DICKINSON, P.J., KITCHENS, CHANDLER AND KING, JJ., CONCUR.  COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., AND PIERCE, J.**

**COLEMAN, JUSTICE, DISSENTING:**

¶17.    Based on the evidence and testimony presented, it is my opinion that the Commission's decision was supported by substantial evidence; therefore, I respectfully dissent.

¶18.    Under the Mississippi Workers' Compensation Act, an employee may be entitled to compensation for disability from an injury "arising out of and in the course of employment." Miss. Code Ann. § 71-3-7(1) (Supp. 2013).  However, "[n]o compensation shall be payable . . . if it was the willful intention of the employee to injure or kill himself or another."  Miss. Code Ann. § 71-3-7(4) (Supp. 2013).  In the instant case, Smith was injured on the job while working for Tippah Electric Power Association, and he filed a petition to controvert with the Mississippi Workers' Compensation Commission.  Tippah responded that Smith was not entitled to compensation, claiming he had injured himself intentionally in an attempt to commit suicide.  The administrative judge found sufficient evidence to support Tippah's position and held that Smith's injuries were not compensable.  The Commission affirmed,

8

as did the Court of Appeals.

¶19.    The majority correctly cited the standard of review for appeals from the Workers'

Compensation Commission but, because the instant case turns on whether the Commission's

decision was supported by substantial evidence, it is worth repeating the standard.

> The standard of review in a workers' compensation appeal is limited to
> whether the Commission's decision is supported by substantial evidence.
> *Walker Mfg. Co. v. Cantrell*, 577 So. 2d 1243, 1245-47 (Miss. 1991). "The
> Workers' Compensation Commission is the trier and finder of facts in a
> compensation claim, the findings of the Administrative Law Judge to the
> contrary notwithstanding." *Smith v. Container Gen. Corp.*, 559 So. 2d 1019,
> 1021 (Miss. 1990). This Court will reverse an order of the Workers'
> Compensation Commission only where such order is clearly erroneous and
> contrary to the overwhelming weight of the evidence. *Vance v. Twin River
> Homes, Inc.*, 641 So. 2d 1176, 1180 (Miss. 1994).

*Lott v. Hudspeth Ctr.*, 26 So. 3d 1044, 1048 (¶ 12) (Miss. 2010).  The Court has provided

the following definition of substantial evidence:

> Substantial evidence, though not easily defined, means something more than
> a mere scintilla of evidence, [and] it does not rise to the level of a
> preponderance of the evidence. It may be said that it means such relevant
> evidence as reasonable minds might accept as adequate to support a
> conclusion. Substantial evidence means evidence which is substantial, that is,
> affording a substantial basis of fact from which the fact in issue can be
> reasonably inferred.

*Miss. Dep't of Human Servs. v. McNeel*, 869 So. 2d 1013, 1018 (¶ 19) (Miss. 2004)

(quoting *Delta CMI v. Speck*, 586 So. 2d 768, 773 (Miss. 1991) (internal citations omitted)).

Because no one witnessed the incident, the majority maintains that "there was no direct

evidence" of how Smith came in contact with the lines and concludes that the Commission's

decision was "based on assumptions and speculation regarding how the accident occurred."

(Maj. Op. ¶¶ 13-14.)  It is undisputed that no one saw Smith in the seconds preceding the

9

accident, and no one could testify as to how Smith came in contact with both the primary and neutral lines, which are several feet apart. However, based on the testimony and evidence presented, it is my opinion that there is substantial evidence in the record from which it could be "reasonably inferred" that Smith intentionally grabbed the lines.[8]

¶20. Smith had worked for Tippah for approximately sixteen years at the time of the accident. He had been trained on the job, he had attended lineman training classes, and he attended safety classes every other month. Smith considered himself to be an experienced lineman, and he was considered by his coworkers and employers to be a good lineman. Smith testified that "he knew what would result if one were to touch a hot phase and a neutral phase at the same time." Although Smith claims that he did not touch the neutral line, the evidence indicates that he unquestionably did. Several witnesses testified that they saw Smith with one hand on the neutral line and one hand on the primary line immediately after the accident. The palms of Smith's gloves were burned, indicating that he was holding both lines, contrary to Smith's testimony that he raised up and bumped into the line. Smith was wearing leather gloves, but he admitted he should have been wearing rubber gloves, which is required when coming within two feet and one inch of the primary line.

¶21. The distance between the primary line and neutral line was approximately three feet and seven inches, making it unlikely that Smith would be accidentally in contact with both lines simultaneously. Michael Glen Weltzheimer, assistant to the vice president of safety and

---

[8] The administrative judge and the Court of Appeals outlined the testimony presented in detail. *See **Smith v. Tippah Elec. Power Ass'n**, 2012-WC-00502-COA, 2013 WL 2303524 (Miss. Ct. App. May 28, 2013).

loss control for the Electric Power Association of Mississippi, investigated the scene and took the measurements after the incident. He testified at the hearing. The administrative judge wrote:

> [Weltzheimer] also took measurements at the scene. This was to see if the line met code which he opined that it did. He said that the distance between the primary and the neutral at the sag was 3 feet 7 inches. He said a perfect sag would be 4 feet. Closer to the pole the distance between the line was 3 feet 9 inches, closer to 4 feet. He testified that he had not heard of other situations where someone had come in contact with both wires with [his] hands or arms. He has heard of instances where one body part came in contact with one and some piece of equipment came in contact with the other.

*See Smith*, 2013 WL 2303524, *6.

¶22.    Finally, Smith was under investigation for murder, and law enforcement officials had obtained a DNA sample from him days prior to the incident. Several coworkers testified that Smith's demeanor was different on the day of the incident, and he was not joking around as he usually did. Another said there had been tension among the crew for the past two weeks. Danny Caples arrived at the site to take Smith in for a drug test, because his employer suspected Smith was using drugs. The fact that Smith's employer, who had known him for sixteen years, was suspicious that he had been using drugs is further indication that Smith had been acting differently.

¶23.    Certainly, it would be preferable to have more eyewitness testimony, but I cannot say that the Commission's decision was "clearly erroneous and contrary to the overwhelming weight of the evidence." *See Lott*, 26 So. 3d at 1048 (¶ 12) (quoting *Vance*, 641 So. 2d at 1180). In my opinion, the evidence presented in support of Tippah's position that Smith intentionally grabbed the lines is certainly more than a "mere scintilla" and provides "a

substantial basis of fact from which the fact in issue can be reasonably inferred." *McNeel*, 869 So. 2d at 1018 (¶ 19) (quoting *Delta CMI*, 586 So. 2d at 773). Because the standard of review is limited to whether the Commission's decision is supported by substantial evidence, and I believe it was, I would affirm.

**RANDOLPH, P.J., AND PIERCE, J., JOIN THIS OPINION.**