# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-WC-00941-COA

**DANIEL LADNER**                                                                 **APPELLANT**

**v.**

**HINTON HOMES LLC AND AMFED**                                     **APPELLEES**
**CASUALTY INSURANCE COMPANY**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/17/2024 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEY FOR APPELLANT: | MICHAEL L. FONDREN |
| ATTORNEYS FOR APPELLEES: | JEFFREY STEPHEN MOFFETT |
| | CHRISTOPHER MICHAEL GRAVES |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | AFFIRMED - 05/06/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McCARTY AND WEDDLE, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Daniel Ladner was employed as a house framer and fell from the roof of a custom-home build while nailing plywood decking. Ladner sustained injuries to his head and back. He was taken to the hospital and tested positive for marijuana. Ladner's claim for workers' compensation benefits was denied by an administrative judge (AJ) after an evidentiary hearing, and his claim was likewise denied on appeal to the Mississippi Workers' Compensation Commission. The Commission found that Ladner failed to prove by a preponderance of the evidence that intoxication was not a contributing cause of the accident pursuant to Mississippi Code Annotated section 71-3-121(1) (Rev. 2021) and affirmed the AJ's order denying and dismissing Ladner's claim for benefits. Ladner appeals. Upon

review, we find that the Commission's decision is supported by substantial evidence, and, accordingly, we affirm.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2.     Scott Penton hired Ladner to assist as a framer on a custom-home build. Penton was a framing contractor for Hinton Homes LLC, the general contractor on the project. On July 22, 2020, Ladner was nailing plywood decking on the home's roof when he fell through a hole to the concrete foundation below, sustaining injuries to his head and back. Ladner was taken by ambulance to George Regional Hospital. While at the hospital, a urine test was administered that was positive for marijuana.[1]

¶3.     Ladner sought workers' compensation benefits for the injuries he sustained as a result of his fall. He filed a petition to controvert with the Commission on November 18, 2020. In response, Hinton Homes and its carrier (collectively, Hinton Homes)[2] admitted that an employer/employee relationship existed between Ladner and Hinton Homes "insofar as [Ladner] was employed by a subcontractor of [Hinton Homes]." Hinton Homes further admitted that "but for apparent intoxication," the accident occurred while Ladner "was performing service arising from and in the course of employment" and "arose out of the

---

[1] Specifically, the urine test was positive for "cannabinoid," a chemical constituent of marijuana.

[2] Penton was Hinton Homes's subcontractor. As the general contractor on the project, Hinton Homes is Ladner's "statutory" employer pursuant to Mississippi Code Annotated section 71-3-7(6) (Rev. 2021). AmFed Casualty Insurance Company is Hinton Homes' workers' compensation carrier.

2

alleged employment." Hinton Homes raised as an affirmative defense that Ladner's claim was barred by section 71-3-7(4), which provides that "[n]o compensation shall be payable if the [claimant's] use of drugs illegally . . . was the proximate cause of the injury," and "a presumption of intoxication exists based on [section] 71-3-121(1)."[3]

¶4. An evidentiary hearing before the AJ was held on September 28, 2023. Ladner and Penton testified at the hearing. The parties stipulated to the admissibility of certain exhibits, including Penton's July 28, 2022 deposition, records from the ambulance service from the day of the accident, and Ladner's medical records from George Regional Hospital, where Ladner was taken by ambulance after his fall.

¶5. Penton testified that Ladner was working for him on July 22, 2020, as part of a crew Penton had hired to frame a house for Hinton Homes. Ladner had worked for Penton before, generally working to help frame houses under construction. On the day of the accident, Penton picked up Ladner at his home and drove him to the job site in Agricola, Mississippi, which was about a forty-five-minute drive. Penton testified he did not smell any marijuana or alcohol on Ladner. He said that if he had, he would have taken Ladner back to his house. Penton said that he would make any crew worker leave the job site if he suspected alcohol or drug use. Penton said he saw no sign of marijuana use, and he saw no sign that Ladner

---

[3] Section 71-3-121(1) provides that if an employee has a positive test for an illegal drug following a work-related injury, "it shall be presumed that the proximate cause of the injury was the use" of such drug. The burden of proof then shifts to the injured worker "to prove that the use of drugs illegally . . . was not a contributing cause of the accident in order to defeat the defense of the employer provided under Section 71-3-7."

was under the influence of marijuana.

¶6.     Penton testified that Ladner fell not too long after lunch. Penton and some of the other crew members left the job site for lunch and were gone for about an hour. Ladner did not go with them. Penton thought there may have been one other worker on the work site with Ladner during the lunch hour. Penton said that after lunch, he saw Ladner going up on the roof to start working again. This was the only time he saw him before the fall because Penton was working on the other side of the house from where Ladner was nailing roof decking.

¶7.     After Ladner fell, one of the other crew members came and got Penton and took him to where Ladner had fallen. Penton asked Ladner what he could do for him. Ladner told Penton he thought he needed to go to the hospital, so Penton called an ambulance. The ambulance records reflect that the ambulance was called at 2:45 p.m. Penton acknowledged that after the fall, he did not hear anyone say that Ladner appeared impaired or that they suspected that Ladner was under the influence of marijuana or alcohol when he fell.

¶8.     Penton explained that Ladner's job was to tack (nail) down plywood sheets (decking) to the underlying rafters. The decking had already been placed in position by another crew member. At the time of the accident, Ladner was nailing down the last piece of decking. Penton acknowledged a decking board could give way if one end were not centered on a rafter, but he was "puzzled" by how the accident happened in this situation because the hole Ladner was covering at the time was only two feet by four feet. Penton could not understand

4

"how you go through a hole that small." Penton said that this type of accident had happened to him in the past, but he had always been able to catch himself on the rafters before falling all the way through.

¶9. Ladner testified that he was not under the influence of any drugs on the day of his accident, and he specifically denied that he had smoked marijuana during lunch. He "is not a big drinker," and he confirmed he had not had any alcoholic beverages on the day of his fall or the night before. He corroborated Penton's testimony that Penton picked him up on the day of the accident to take him to the work site. He said he got up at 4:30 a.m. that morning and rode with Penton in the front seat of Penton's truck for the forty-five-minute trip.

¶10. When Ladner arrived at the work site, Penton told him he would be nailing the decking plywood on the roof of the house. Ladner explained that he used a nail gun to secure the plywood decking to the frame of the house. He did this by walking up the roof line while nailing a seam, then walking backward while nailing an adjoining seam. According to Ladner, he routinely stops every five nail shots to look behind him "to make sure I'm not walking off the edge of the roof, to make sure I'm not going to step in a hole, and to make sure that everything is clear." He also testified that he guards against the risk of falling by carefully reaching back with his foot and relying on sensation to tell whether it is safe to put his weight down. Ladner admitted there is no way to know if a piece of decking was cut short "until you put your foot on it" because the underlying rafter is hidden from sight.

¶11.   Ladner testified that as he was nailing a seam of plywood next to a window dormer, the plywood shifted and caused him to fall through about a four feet by four feet hole,[4] causing cuts to his arms before he landed on the concrete foundation below.  He said that one side of the board gave way "because it was not properly [resting] on the rafters" when he stepped down on it and he fell through the gap that was created.  He also testified that there was nothing to indicate that the board would give way.

¶12.   After the fall, Ladner said he briefly lost consciousness.  When he woke up, Penton was applying an ice pack to his head.  Penton asked Ladner "what [he] wanted to do . . . [and Ladner] told him [he] needed to go to the hospital."  Penton called for an ambulance.  Ladner said that before the ambulance got there, he saw Penton climb on the roof with a piece of plywood (a "scab") and re-lay the decking in the space where Ladner had fallen.

¶13.   Ladner was taken by ambulance to George Regional Hospital and stayed there for seven days.  The ambulance records provide that Ladner was given fentanyl for pain management three times on the way to the hospital.  The hospital records show that a urine test was performed at 3:50 p.m. on July 22, 2020 (the day of the accident), and it was positive for "cannabinoid."  The toxicology section of the urinalysis report provides that "THE URINE DRUGS OF ABUSE (DOA) PROFILE PERFORMED BY GEORGE REGIONAL HEALTH SYSTEM LABORATORIES IS ONLY A SCREENING TEST.  ANY POSITIVES ON THIS SCREEN MUST BE CONFIRMED BY GC/MS IF ORDERED BY

_____

[4] As noted, Penton testified that he thought the hole was about two feet by four feet.

6

THE ATTENDING PHYSICIAN OR NURSE PRACTITIONER." Ladner's "patient record" taken by a nurse at the hospital that afternoon shows "Drug Use: THC."

¶14. When Ladner testified at the hearing, he acknowledged that after his accident he tested positive for marijuana. Ladner did not know what type of test was performed at the hospital. He testified that it had been "at least two weeks" before the accident since he last smoked marijuana.

¶15. Ladner testified that he first began using marijuana in 2011 "[a]fter he got out of the military," and that was the only drug he used at the time. He said he suffered from post-traumatic stress disorder (PTSD) and the marijuana helped him cope with it. Ladner acknowledged that he was arrested for possession with intent to sell methamphetamine in 2014, but he said he did not use methamphetamine. He said he was only convicted of intent to sell methamphetamine because "the woman [he] was with at the time . . . was on it and selling it, and [he] was just there." Ladner completed his prison sentence for that conviction in 2018.

¶16. Ladner testified that he did not use marijuana after completing his prison sentence in 2018 except for the one time, two weeks before his accident. The reason he used it then was because "everything was just going crazy" in his life, so he "got a little joint" from a coworker[5] and smoked it to help him deal with his stress and PTSD. Ladner testified that part of the stress he was experiencing included a child-support hearing that was scheduled

---

[5] Lander did not get the joint from his coworker at the work site or while on the job.

after the accident. Ladner also testified that he had not had the urge to smoke marijuana since that date (two weeks before his accident) even though the child-support hearing was still pending.

¶17. Following the hearing, the AJ issued his order on November 14, 2023. In his order, the AJ set forth detailed findings of fact and his conclusion "that [Ladner's] proof presented at the hearing on compensability failed to amount to substantial evidence showing that intoxication was not a contributing cause of the accident pursuant to [section] 71-3-121 . . . . Therefore, this claim is denied and dismissed."

¶18. Ladner filed his petition for review of the AJ's decision on November 28, 2023. On January 9, 2024, Ladner filed a "Motion for Leave of Court to Depose Doctor and/or Medical Provider" seeking "to depose the doctor and/or medical provider that relied upon and/or administered the drug test [at George Regional Hospital] so that the Commission may consider the doctor's and/or medical provider's testimony."

¶19. In its order entered on July 17, 2024, the Commission affirmed the AJ's November 14, 2023 order with the clarification, though, that the proper burden of proof Ladner must meet "in order to prove his intoxication was not a contributing cause of his work accident . . . [is by a] preponderance of the evidence." The Commission adopted and incorporated by reference the AJ's findings of fact, and determined that "[Ladner] failed to prove by a preponderance of evidence that intoxication was not a contributing cause of the accident pursuant to [section] 71-3-121." The Commission also found that Ladner "did not introduce

8

any medical testimony regarding his drug test and interpretation of the results but instead relied on speculative testimony from witnesses at the scene."

¶20. In its order, the Commission also addressed Ladner's belated motion seeking leave of court to depose the doctor or medical provider who administered the drug test. The Commission began by pointing out that Ladner did not file this motion until after the evidentiary hearing and after the AJ issued his order. As to the merits of Ladner's motion, the Commission found that it was "an attempt . . . to introduce additional evidence that was available prior to the hearing because the AJ did not rule in [Ladner's] favor." The Commission viewed Ladner's motion as "an effort to re-litigate the matter and seek medical testimony in an attempt to prove by a preponderance of evidence that intoxication was not a contributing cause of the accident." Under these circumstances, the Commission concluded, "The Motion does not provide a reasonable justification why the requested evidence/deposition was not introduced at the hearing and is merely a second bite at the apple. Therefore, . . . [Ladner's motion] is hereby denied."

¶21. Ladner appealed the Commission's July 17, 2024 order but asserted only that the "Commission committed reversible error in that the Claimant, Daniel Ladner, met his burden in proving by a preponderance of the evidence that intoxication was not a contributing cause of the subject accident." Ladner did *not* appeal the Commission's denial of his "Motion for Leave of Court to Depose Doctor and/or Medical Provider," and he offers no argument relating to the Commission's denial of that motion in his appellant's brief.

9

**STANDARD OF REVIEW**

¶22. "[T]he Commission is the ultimate finder of fact in workers' compensation cases, and where substantial credible evidence supports the Commission's decision, then, absent an error of law, the decision must stand without judicial interference." *Jones v. Miss. Baptist Health Sys. Inc.*, 294 So. 3d 76, 80 (¶21) (Miss. 2020). Although the Commission corrected the AJ's application of the wrong burden of proof, the Commission did adopt the AJ's findings of fact and made its own additional findings in reaching its decision in this case. We give "substantial deference" to these findings. *Sims v. Delta Fuel*, 308 So. 3d 859, 867 (¶28) (Miss. Ct. App. 2020).

¶23. In abiding by our "limited and deferential" standard of review, "[w]e will reverse only when a Commission order is not based on substantial evidence, is arbitrary or capricious, or is based on an erroneous application of the law." *Meek v. Cheyenne Steel Inc.*, 360 So. 3d 259, 262 (¶8) (Miss. Ct. App. 2022) (internal quotation marks omitted). "Substantial evidence . . . has been said to be such relevant evidence as reasonable minds might accept as adequate to support a conclusion." *Imperial Palace of Miss. LLC v. Ryan*, 113 So. 3d 630, 632 (¶10) (Miss. Ct. App. 2013) (internal quotation marks omitted). "An administrative agency's decision is arbitrary when it is not done according to reason and judgment, but depending on the will alone." *Pub. Emps.' Ret. Sys. v. Shurden*, 822 So. 2d 258, 264 (¶15) (Miss. 2002). And we will only deem an agency's "action . . . capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for

10

the surrounding facts and settled controlling principles." *Id.* "We review the Commission's

application of the law de novo." *Meek*, 360 So. 3d at 262 (¶8).

**DISCUSSION**

¶24.    Ladner asserts that the Commission erred when it denied his workers' compensation

claim by (1) misapplying section 71-3-121(1) concerning his positive test for an illegal drug

(marijuana) following his fall at work; and (2) ignoring the purportedly "overwhelming

substantial evidence" that marijuana did not contribute to his injury.   For the reasons

addressed below, we are not convinced by Ladner's assertions.   Rather, we find that the

Commission properly applied the law and that its finding that Ladner "failed to prove by a

preponderance of evidence that intoxication was not a contributing cause of the accident

pursuant to [section] 71-3-121" is  supported by substantial evidence and is neither arbitrary

nor capricious.

**I.    Statutory Framework and Burden of Proof**

¶25.    Hinton Homes raised section 71-3-7(4) as an affirmative defense in its response to

Ladner's petition to controvert.  Section 71-3-7(4) provides that "[n]o compensation shall be

payable if the use of drugs illegally . . . was the proximate cause of the [employee's]

injury . . . ."  Miss. Code Ann. § 71-3-7(4).

¶26.    If an employee has a positive drug screen following a workplace injury, section 71-3-

121(1) provides for a statutory presumption and burden-shifting framework, as follows:

> If the employee has a positive test indicating the presence, at the time of injury,
> of any drug illegally used . . . , it shall be presumed that the proximate cause

11

of the injury was the use of a drug illegally . . . . The burden of proof will then be placed upon the employee to prove that the use of drugs illegally . . . was not a contributing cause of the accident in order to defeat the defense of the employer provided under Section 71-3-7.

Miss. Code Ann. § 71-3-121(1).

¶27. Following his fall, Ladner was taken by ambulance to the hospital. A urine test taken at the hospital that same afternoon was positive for marijuana. Thus, the statutory presumption applies here. As this Court recently explained:

> [T]he presence of a specific level of marijuana is not what triggers the statute. Section 71-3-121(1) clearly states that if a drug test shows "the *presence*, at the time of injury, of any drug illegally used . . . it shall be presumed that the proximate cause of the injury was the use of a drug illegally." (Emphasis added). Marijuana, being a Schedule 1 Controlled Substance, was illegal at the time of Meek's accident and no mechanism existed by which he could have legally ingested it. We find, therefore, that it was the very presence of marijuana in his system at the time that violated section 71-3-121(1).

*Meek*, 360 So. 3d at 264 (¶17). Here, Ladner does not contend that he was legally prescribed marijuana pursuant to the Mississippi Medical Cannabis Act, Mississippi Code Annotated section 41-137-1 through 41-137-67 (Rev. 2023), thus he could not have legally used marijuana on the day he was injured. Marijuana was—and still remains—a Schedule 1 Controlled Substance. Miss. Code Ann. § 41-29-113(d)(23)(A) (Rev. 2023).

¶28. Regarding the applicable burden of proof, Ladner, as the workers' compensation claimant, "bears the burden of proving by a 'fair preponderance of the evidence' each element of [his] claim." *Romine v. Allied Waste N. Am. Inc.*, 50 So. 3d 372, 375 (¶12) (Miss. Ct. App. 2010) (quoting *Moore v. Indep. Life and Accident Ins. Co.*, 788 So. 2d 106, 112

12

(¶19) (Miss. Ct. App. 2001)). Typically, the party raising an affirmative defense in response to a claim bears the burden of proof with respect to that defense. *See, e.g.*, *Smith v. Tippah Elec. Power Ass'n*, 138 So. 3d 900, 904 (¶13) (Miss. 2014). But as plainly set forth in section 71-3-121(1), Ladner's positive drug test for marijuana in this case *shifted* the burden of proof to Ladner "to *prove* that the use of drugs illegally . . . *was not a contributing cause of the accident*." Miss. Code Ann. § 71-3-121(1) (emphasis added). Ladner must do so "in order to defeat" Hinton Homes' "defense . . . provided under Section 71-3-7." *Id.* In short, Ladner was required to prove this element of his claim by a preponderance of the evidence, as the Commission correctly determined.

## II. Analysis

¶29. Ladner does not dispute that his urine test on the day of the accident was positive for marijuana, nor does he dispute that his patient records from that day show that he reported THC use when his medical history was taken by a nurse at the hospital. Further, as the AJ found, although Ladner testified that his fall was caused by improperly cut and placed decking, Ladner *also* testified "that he looked behind him every five nail shots, and he did not see any hazard behind him just before his fall." In elaborating on how he guards against the risk of falling, Ladner also explained that he carefully reaches back with his foot and relies on sensation to tell whether putting his weight down on the next board is safe.

¶30. Additionally, the AJ found that although Ladner's fall was not witnessed, Penton testified that he was "puzzled" by how Ladner fell because, according to Penton, the hole

13

Ladner was covering at the time was only two feet by four feet.[6] Penton could not figure out how Ladner could "go through a hole that small." Penton said he had similar accidents happen to him in the past, and he has always been able to catch himself on the rafters before falling all the way through.

¶31. Ladner also testified that he smoked marijuana two weeks before his accident due to stress and his PTSD. He said that part of the stress he was experiencing included a child-support hearing that was scheduled *after* the accident—the hearing was weeks away at the time Ladner sought marijuana and admittedly used it. But Ladner testified that he did not have the urge to smoke marijuana again between that day and the accident, even though the child-support hearing was still pending at that time.

¶32. The AJ heard all the testimony and reviewed the contents of the record, ultimately determining that Ladner failed to show "that intoxication was not a contributing cause of the accident pursuant to [section] 71-3-121."

¶33. Upon review, the Commission affirmed the AJ's November 14, 2023 order, but clarified the proper burden of proof that Ladner was required to meet. With this clarification, the Commission adopted the AJ's findings of fact and determined that "[Ladner] failed to prove by a preponderance of evidence that intoxication was not a contributing cause of the accident pursuant to [section] 71-3-121." The Commission also explicitly found that Ladner failed to "introduce any medical testimony regarding his drug test and interpretation of the

---

[6] Ladner testified that the hole was four feet by four feet.

14

results but instead relied on speculative testimony from witnesses at the scene." On appeal, we are bound to give "substantial deference" to these findings. *Sims*, 308 So. 3d at 867 (¶28).

¶34. Ladner asserts, however, that he met his burden to prove "that the use of drugs illegally . . . was not a contributing cause of the accident," Miss. Code Ann. § 71-3-121(1), because he does not rely on his denial of intoxication alone to meet this burden. He advances three arguments on this point. Namely, Ladner asserts: (1) Penton testified that he observed no sign that Ladner was under the influence of marijuana on the day of his fall; (2) Ladner's medical records from that day contained no notation that he was intoxicated; and (3) the urine drug screen test did not indicate the *level* of cannabinoid (marijuana) in Ladner's system to demonstrate whether he was under the influence of marijuana on the day of the accident. We address each assertion in turn.

¶35. With respect to Penton's testimony, we begin by pointing out that Ladner's fall occurred "shortly after lunch." Penton, however, testified almost exclusively about Ladner's behavior and appearance that *morning*—before the accident occurred. Penton testified that he left the job site during lunch, while Ladner remained on the job site. Penton had no interaction with Ladner after returning from lunch; he merely saw Ladner going up on the roof to start working again. Penton began working on the other side of the house from Ladner and did not see him again until another crew member took him to Ladner after he fell. In short, Penton had no way of knowing if Ladner had used marijuana during his lunch hour,

15

nor did Penton have any opportunity after lunch to observe Ladner's appearance or behavior in any meaningful way.

¶36.    We recognize that Penton also testified that Ladner did not appear to be under the influence of marijuana when Penton went to Ladner after he fell. But Penton was met with an emergency situation. Indeed, Penton testified that when he reached Ladner, he was concerned with "see[ing] what he could do for [Ladner]," and he called an ambulance at Ladner's request. Given Ladner's head injury and the emergency situation, the Commission could have reasonably inferred that Penton may not have been focused on discerning whether Ladner was under the influence of an illegal drug at that time.

¶37.    We also observe that given the dangerous nature of the job Ladner was doing that day, even if he were not *visibly* under the influence of marijuana, his coordination or judgment still could have been sufficiently affected by marijuana use to constitute a "contributing cause" to his accident. Miss. Code Ann. § 71-3-121(1). In any event, as the appellate court, we "will not determine where the preponderance of the evidence lies when the evidence is conflicting, the assumption being that the Commission, as the trier of fact, has previously determined which evidence is credible, has weight, and which is not." *Perez v. Howard Indus. Inc*., 150 So. 3d 141, 145 (¶13) (Miss. Ct. App. 2014) (quoting *Metal Trims Indus. Inc. v. Stovall*, 562 So. 2d 1293, 1297 (Miss. 1990)).

¶38.    Regarding Ladner's medical records, Ladner seeks to prove a negative inference that because these records did not have a notation that he was under the influence of marijuana

16

on the day of his accident, this means he was not. In particular, Ladner asserts that "the EMTs definitely would have noted" if Ladner were under the influence of marijuana and "[w]ithout a doubt, [medical personnel] would have diagnosed . . . Ladner as being under the influence of marijuana if he were." But this is merely argument of counsel, which is not proof of the purported facts asserted. *One 1970 Mercury Cougar v. Tunica County*, 115 So. 3d 792, 796 (¶20) (Miss. 2013) ("No citation of authority is necessary for the fundamental propositions that issues of fact are decided by the weighing of evidence, and that the arguments of counsel are not evidence.").

¶39. Ladner did not present testimony from any medical personnel on duty that day who could address that issue. As the Commission explicitly stated in its order, "[Ladner] appears to have realized [that he lacked medical testimony to prove his assertions], as he filed a Motion for Leave of Court to Depose Doctor and/or Medical Provider after the AJ had issued his Order." The Commission denied that motion, and Ladner did not appeal that ruling.

¶40. At any rate, we find that Ladner's attempt to create a negative inference in this manner is speculative, at best. Ladner's medical records included a urine drug screen test that was positive for marijuana, and his "patient record" provided "Drug Use: THC." Further, the ambulance records from the day of his accident provide that Ladner was given fentanyl for pain management three times between 2:50 and 3:24 p.m. during the trip to the hospital. As the trier of fact, the Commission could have just as easily inferred that medical personnel were focused on the emergency at hand and did not assess whether Ladner was under the

17

influence of marijuana, particularly given that he was administered a total of 75 micrograms of fentanyl in transport.

¶41. Ladner also takes issue with his urine drug screen test. He asserts that the test "does not test for an analytical result," and he points out that the test results contain the caveat that the test was "only a screening test. Any positives must be confirmed by GC/MS[7] if ordered by the attending physician or nurse practitioner." The plain language of section 71-3-121(1), however, requires only "*a* positive test indicating the *presence*, at the time of injury, of any drug illegally used" to trigger the statutory presumption. Miss. Code Ann. § 71-3-121(1) (emphasis added). Section 71-3-121(1) does *not* require two positive tests, and "the presence of a *specific level of marijuana* is *not* what triggers [section 71-3-121(1)]." *Meek*, 360 So. 3d at 264 (¶17) (emphasis added). Rather, it is simply "the *presence*, at the time of injury, of any drug illegally used" that triggers the statutory presumption. *Id.* (emphasis added) (quoting § 71-3-121(1)).

¶42. Once the presumption was triggered, the burden shifted to Ladner to prove by a preponderance of the evidence that the marijuana use "was not a contributing cause of [his] accident." Miss. Code Ann. § 71-3-121(1). Ladner *could have* obtained a second and more sophisticated test of his urine sample in an effort to meet this burden, but he did not do so.

¶43. Similarly, Ladner asserts that his urine drug screen test "cannot and does not show when marijuana was used or if [he was] under the influence. It just shows that [he was]

---

[7] GC/MS stands for "Gas Chromatography/Mass Spectrometry."

positive for having cannabinoid in his urine." Ladner, however, offered no medical testimony to explain these assertions, as the Commission recognized. His argument is not evidence, as we have already noted above. *One 1970 Mercury Cougar*, 115 So. 3d at 796 (¶20).

¶44. Lastly, Ladner relies on the now abolished "beneficent purposes" workers' compensation maxim in asserting that any "doubts" in his case should be resolved "in favor of compensation whenever reasonably possible," citing Vardaman S. Dunn, *Mississippi Workmen's Compensation* § 33, at 32 (reprint 1990) (3d ed. 1982). This principle, however, was "legislatively abolished for injuries occurring on or after July 1, 2012," *Darty v. Gulfport-Biloxi Reg'l Airport Auth.*, 345 So. 3d 1214, 1216 (¶10) (Miss. Ct. App. 2022), long before Ladner's July 22, 2020 fall. Statutory law now espouses an even-handed approach in addressing workers' compensation claims, as follows:

> [T]his chapter shall be fairly and impartially construed and applied according to the law and the evidence in the record, and, notwithstanding any common law or case law to the contrary, *this chapter shall not be presumed to favor one party over another and shall not be liberally construed in order to fulfill any beneficent purposes*.

Miss. Code Ann. § 71-3-1(1) (Rev. 2021) (emphasis added). We find no evidence that the Commission failed to comply with this mandate in any manner.

¶45. For all the above-stated reasons, we find that the Commission properly applied section 71-3-121(1). We further find that the Commission's determination that Ladner "failed to prove by a preponderance of evidence that intoxication was not a contributing cause of the

19

accident pursuant to [section] 71-3-121" is supported by substantial evidence and is neither arbitrary nor capricious.

¶46. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR. WESTBROOKS AND McDONALD, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**