# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CC-00029-COA

**HANDYMAN HOUSE TECHS, LLC**                                        **APPELLANT**

**v.**

**MISSISSIPPI DEPARTMENT OF**                                        **APPELLEE**
**EMPLOYMENT SECURITY**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/15/2020 |
| TRIAL JUDGE: | HON. ISADORE W. PATRICK JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | KAYE J. PERSONS |
| ATTORNEYS FOR APPELLEE: | ALBERT B. WHITE |
| | JAMES RANDALL BUSH |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 04/05/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.

### WESTBROOKS, J., FOR THE COURT:

¶1.     Handyman House Techs LLC (Handyman), a repair and remodeling business, appeals the Hinds County Circuit Court's decision to affirm the Mississippi Department of Employment Security (MDES) Board of Review's determination that Glenn Williams was an employee under the Mississippi Employment Security Act. Handyman asserts that MDES misapplied the law and relied on insubstantial evidence to arbitrarily and capriciously find that Williams was Handyman's employee instead of an independent contractor. Finding no error, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2.     Handyman is a Gulfport, Mississippi, business owned by Vernon Wilson. Handyman hires its office staff, project managers, and customer-service representatives through Aim Management LLC. Williams is a sixty-year-old unlicensed worker with skills in carpentry and general maintenance. He has worked in the field since the age of eighteen and has previously been employed by Connelly Construction and Lindsey Mechanical.

¶3.     Handyman hired Williams to work as a general maintenance and repair man. Williams worked for Handyman for a total of eleven days while on a thirty-day probationary period. During that time, Williams accepted and completed four projects to customer satisfaction. While Williams was completing his fifth project, Handyman instructed him not to return to the job site.

## A.     Harrison County Circuit Court Proceedings

¶4.     On June 19, 2015, Williams filed a claim for unemployment benefits in Harrison County. On his "I-501 Initial Claim For Benefits" form, Williams wrote that he worked for Handyman from May 25, 2015, to June 5, 2015. It also reads that Handyman paid Williams twenty-five dollars an hour and that Williams' highest level of education is the eighth grade. MDES mailed Williams a "Benefit Rights Summary Statement" which provided that Williams remained eligible for benefits if he was "unemployed through no fault of his own." It further provided that Williams could be disqualified from receiving benefits if he "left work without good cause under the Law" or if he was "discharged for misconduct connected with [his] work." According to Handyman's brief, the MDES claims examiner reviewed and

2

denied Williams' claim for unemployment benefits. The claims examiner found that Williams had not shown good cause for leaving his employment.

¶5. On August 7, 2015, Williams appealed the MDES claims examiner's denial. The administrative law judge (ALJ) conducted a hearing and found that Williams was eligible for unemployment benefits. Handyman appealed to the Board of Review and contended that it was error for the ALJ to find that Williams was eligible for unemployment benefits without deciding whether Williams was Handyman's employee. The Board of Review affirmed the ALJ's determination that Williams was eligible for unemployment benefits.

¶6. Handyman appealed to the Harrison County Circuit Court, which found that the Board of Review erred by finding Williams eligible for benefits without first determining whether Williams was Handyman's employee. The circuit court thus ordered:

> [T]he issue as to Glen[n] Williams' status as an employee of Handyman House, or an independent contractor and not an employee, is hereby remanded to the MDES tax department for a determination, with all appeal rights to the parties both within the MDES and to the Courts. It is further ordered and adjudged that the separate job separation issue before this Court should be stayed pending a determination by the MDES of Glen[n] Williams' employment status as an employee or independent contractor by the MDES, or by the Hinds County Circuit Court, or Supreme Court on further appeal.

The matter of whether Williams voluntarily left his employment has not been appealed and is not before this Court.

## B. Remand Proceedings Before MDES

¶7. On September 27, 2016, pursuant to the Harrison County Circuit Court's order, MDES notified Williams of an ongoing investigation into his claim for benefits and to

3

determine if he was Handyman's "employee or an independent contractor." MDES requested that Williams fill out a "Form UIFD-23" otherwise known to MDES as the independent-contractor questionnaire. MDES also requested that Williams return the form by fax or contact Unemployment Field Tax Representative Johnny Wigington. Representative Wigington also sent Handyman an independent-contractor questionnaire to complete.

¶8. On October 7, 2016, Handyman returned a completed independent-contractor questionnaire to Representative Wigington, but Williams did not. Handyman also submitted its subcontractor agreement, general-insurance-liability agreement, non-disclosure agreement, non-compete agreement, and non-solicitation agreement. On October 10, 2016, Representative Wigington sent Representative Eldridge Rose correspondence stating that Handyman's independent-contractor questionnaire lists Williams' occupation as carpentry and general maintenance. Representative Wigington further noted that Handyman's questionnaire stated "that the worker does operate under the company's name when performing services for the company" and "that the worker is paid by the job." Representative Wigington concluded that "it does appear that the firm did exhibit control over the worker. It does appear that the firm contradicts itself on the questionnaire, they state that the worker can perform services for others, but they have a non-compete agreement in place to prevent this from taking place."

¶9. On December 22, 2016, in agreement with Representative Wigington, the MDES tax department sent a letter to Handyman stating MDES had found that an employer-employee

relationship existed between Handyman and Williams. On December 30, 2016, Handyman "protested" the tax department's findings and demanded an evidentiary hearing on the matter. On January 23, 2017, a different ALJ notified Handyman that a telephonic hearing was scheduled on February 16, 2017. Due to technological issues, the hearing was continued to April 13, 2017. Representative Wigington, Representative Rose, Wilson, and Williams all testified at the hearing.

¶10. Representative Wigington testified that for independent contractors, the "firm" should not "exhibit [any] control" over "the type of work" or the "time frame of doing the work." When asked if "he had any training or education in the common law test for employees versus independent contractors," Representative Wigington answered, "[N]o, I have not but . . . I try to use the, uh, there's an internal revenue check point, 20 point check list that I'll also look at, refer to." Representative Wigington testified that when he receives a work order, he gathers "the information" and forwards "it straight to the Tax Department." In this case, Representative Wigington forwarded the information to Representative Rose.

¶11. Representative Rose testified that MDES applies the common law factors to determine an individual's employee status. Representative Rose specifically stated that the factors considered are (1) the "employer's right [to] direct and/or control the worker's activities," (2) the "method of payment," (3) "whether or not tools, materials, and/or equipment is supplied," and (4) "whether or not the services being rendered by the worker is a [small] part of the firm's business." Representative Rose also said that "control does not mean . . . micro-

5

managed." Rather it is the "idea that the firm has the right to direct and/or control the worker's activity" and "that's within the common law."

¶12. Williams testified that he did not operate his own business and that he applied to work for Handyman by filling out a "Handyman Sub-Contractor Application." Williams testified that he provided his own transportation and tools and that he received a 1099 tax form. Representative Rose testified that a 1099 form simply indicates who is responsible for the tax.

¶13. Wilson testified that after the worker submits the application, a Handyman project manager would speak with the worker for an hour discussing whether the worker has reliable transportation (not marked with the worker's own business label), tools, and the necessary skills required for the job. Then, Handyman would enter into an "Independent Sub-Contract Agreement" with the worker. Wilson testified that (1) Handyman did not provide training or set a schedule; (2) Handyman did not provide worker's compensation or general liability insurance; and (3) Handyman did not conduct background investigations or drug tests.

¶14. Some facts testified to during the hearing contradict the "Independent Sub-Contract Agreement" (agreement) signed by both parties and produced at the hearing. Under the subheading "roles," the agreement stated that Handyman's "capacity will include, but is not limited to administrative oversight, operational management, and financial control." The agreement also stated that Handyman alone would communicate with the customer and act as a facilitator of disputes. However, Wilson testified that Handyman would not come out

6

to inspect a job unless requested by the customer. If the customer was unsatisfied with the work performed, the customer could call Handyman's office and complain, Handyman would then act as a referee. The agreement also stated that Williams could only represent himself as Handyman's representative to Handyman customers. Williams testified that Handyman instructed him on when and where to show up. He was told that if he was caught "passing out any kind of cards or phone numbers or anything like that, [he] would be terminated immediately." The agreement further stated that Williams was obligated to wear Handyman t-shirts.

¶15. Conversely, Wilson testified that Handyman does not require workers to wear Handyman t-shirts while at work and that it only provides t-shirts to those workers who have been with Handyman for an extended period of time. Williams testified that it was Handyman's policy for Williams to send a text message to every customer alerting them of his estimated arrival time. Once at a job site, Handyman also required Williams to introduce himself as "Mr. Williams, Handyman House Techs" and pass along additional Handyman marketing material such as, pamphlets, brochures, and Handyman's business cards.

¶16. In terms of financial control, the agreement further specified that Williams would provide prices to the customers using Handyman's pricing system and form. Handyman expected Williams to talk to the customer about the work involved, and then estimate the cost of the project. Next, Williams would need to call one of Handyman's project managers and talk about the scope of the project so the project manager could determine the correct price

point. If the customer accepted the price, then Williams would notify Handyman's project manager of the acceptance. Additionally, Handyman set the rate of pay at twenty-five dollars an hour for as many hours as each job took.

¶17. Contrastingly, Wilson stated that when it came to pricing projects, the worker determined the scope of the work and the cost of the job. Then, the worker has to call the project manager to find the "right value." Wilson also stated that the project manager did not dictate the costs, but instead helped the worker with the mathematics and calculations. However, Williams testified that he was forced to "low bid" projects. Moreover, Wilson testified that Handyman would rebid a project "one hundred percent" of the time if the customer thought the price was too high and that in the end Handyman would receive fifty percent of the overall profit.

¶18. After the hearing, the new ALJ found that Williams was an employee and not an independent contractor. Handyman appealed to the Board of Review. On April 17, 2018, the MDES Board of Review affirmed and adopted the ALJ's findings of facts and conclusions of law. Handyman then appealed to the Hinds County Circuit Court. The circuit court reviewed the hearing transcript and found that the Board of Review's decision was supported by substantial evidence. Aggrieved, Handyman appeals asserting that Williams was an independent contractor rather than an employee.

## STANDARD OF REVIEW

¶19. "[O]ur standard for reviewing the decision of an administrative agency is limited."

8

*College Network v. Miss. Dep't of Emp. Sec.*, 114 So. 3d 740, 743 (¶8) (Miss. Ct. App. 2013) (citing *Miss. Emp. Sec. Comm'n v. PDN Inc.*, 586 So. 2d 838, 840 (Miss. 1991)). "We will not disturb the Board of Review's decision unless it: (1) is not supported by substantial evidence, (2) is arbitrary or capricious, (3) falls beyond the scope of authority granted to the agency, or (4) violates a constitutional right." *Id*. (citing *EMC Enter. Inc. v. Miss. Dep't of Emp. Sec*., 11 So. 3d 146, 150 (¶9) (Miss. Ct. App. 2009)).

## ANALYSIS

### I.    Application of the Correct Control Test

¶20.    We address Handyman's initial argument that because Representative Wigington acted arbitrarily and capriciously by applying the wrong test, the agency did too when it made its own determination. This issue has no merit. Our "[r]eview of an order from an administrative agency's proceeding is limited to the record and the findings of the agency." *State Bd. of Nursing v. Hobson*, 283 So. 3d 290, 296 (¶24) (Miss. Ct. App. 2019). In other words, this Court will only address whether the Board's determination was arbitrary and capricious and will not state one way or the other whether Representative Wigington acted arbitrarily and capriciously.

¶21.    In accordance with Mississippi Code Annotated section 71-5-517 (Supp. 2012), Representative Wigington made the initial determination that Williams was an employee and sent his findings to Representative Rose. The ALJ conducted a "fair due process hearing" over the matter on April 13, 2017. Then, the Board of Review found that Williams was an

9

employee and adopted the ALJ's findings of fact and conclusions of law. We now turn to the ALJ's conclusions of law to examine whether the ALJ applied the incorrect test.

¶22. The correct employee-employer test is based on the common law master-servant factors brought forth by the Mississippi Supreme Court. *See Miss. Emp. Sec. Comm'n v. Plumbing Wholesale Co.*, 219 Miss. 724, 732, 69 So. 2d 814, 818 (1954); *Kisner v. Jackson*, 159 Miss. 424, 132 So. 2d 90, 91 (1931). The ALJ stated that he relied on this common law test and listed the control test factors. Handyman provides no support for its claim that the ALJ failed to apply the correct employer-employee test. Without such support, this Court will not find that the Board of Review acted arbitrarily and capriciously when it adopted the ALJ's findings.

## II. The Scope of an Employee

¶23. Handyman contends that there was not substantial evidence for the Board of Review's conclusion that Williams was Handyman's employee. Thus, Handyman reasons that the Board of Review acted arbitrarily and capriciously in reaching its conclusion. "Substantial evidence has been defined as 'such relevant evidence as reasonable minds might accept as adequate to support a conclusion'; the evidence must be more than a 'mere scintilla or suspicion.'" *Hobson*, 283 So. 3d at 294 (¶13) (quoting *Delta CMI v. Speck*, 586 So. 2d 768, 773 (Miss. 1991); *Miss. Real Est. Comm'n v. Anding*, 732 So. 2d 192, 196 (¶13) (Miss. 1999)).

¶24. On appeal, we are to presume that Williams was an employee. *See Miss. Dep't of*

*Emp. Sec. v. Harbin*, 11 So. 3d 137, 139 (¶5) (Miss. Ct. App. 2009) ("[A] rebuttable presumption exists in favor of the administrative agency, and the challenging party has the burden of proving otherwise."). It is Handyman's burden to prove to this Court that the Board of Review's decision should be overturned. *See id.*

¶25. Handyman maintains that Williams was an independent contractor "free from [its] control and direction." Under Mississippi Code Annotated section 71-5-11(I)(14) (Supp. 2012),

> [s]ervices performed by an individual for wages shall be deemed to be employment subject to this chapter unless and until it is shown to the satisfaction of the department that such individual has been and will continue to be free from control and direction over the performance of such services both under his or her contract of service and in fact; and the relationship of employer and employee shall be determined in accordance with the principles of the common law governing the relation of master and servant.

¶26. Our Mississippi Supreme Court, referencing the above section, has declared:

> [t]he test as to who is a servant is stated to be whether the service is rendered by one whose physical conduct, time and activities in the performance of his duties are controlled, or are *subject to the right of control*, by the alleged master under the contract of employment or hire.

*Mozingo v. Miss. Emp. Sec. Comm'n*, 224 Miss. 375, 384, 80 So. 2d 75, 79 (1955) (emphasis added). "The test for employee status is considered on a case-by-case basis. It is a flexible inquiry with 'no talismanic formula' to be mechanically applied." *Sun Vista Inc. v. Miss. Dep't of Emp. Sec.*, 52 So. 3d 1262, 1267 (¶13) (Miss. Ct. App. 2011). "The primary factor is the right to or degree of control." *Id.* at (¶12) (quoting *PDN*, 586 So. 2d at 842).

¶27. This case is distinguishable from our recent decision in *Gulf Coast Transit Services*

11

*LLC v. Mississippi Department of Employment Security*, No. 2020-CC-01315-COA, 2022 WL 98789 (Miss. Ct. App. Jan. 11, 2022). In *Gulf Coast* we applied the common law master-servant test and reversed the agency's decision to deem Frederick Dawkins, a GCTS taxicab lessee, an employee. We found that GCTS did not supervise Dawkins on a day-to-day basis. *Id*. at *4 (¶20). The record showed that GCTS did not pay Dawkins an hourly fee, but that Dawkins "was compensated through his customers." *Id*. Additionally, Dawkins could solicit to customers with his business cards. *Id*. at *5 (¶26). Consequently, in *Gulf Coast*, we held that the record did not substantially show that the company GCTS exercised control over Dawkins. *Id*. at (¶25).

¶28.    GCTS exercised less control over Dawkins than Handyman exercised over Williams. The most important distinction between *Gulf Coast* and the case at bar is that Williams was paid by the hour. Another key distinction is the relationship between the parties. Whereas Dawkins was able to solicit to his own customers, Williams signed a non-compete agreement and a non-solicitation agreement with Handyman. Handyman's project managers, unlike GCTS, directed the projects that Williams would take and had final approval on the pricing and scope of the projects.

¶29.    We now consider whether there was substantial evidence to find that Handyman exercised actual control or a right of control over Williams. To assist in this determination, our Supreme Court provided this employer-employee test:

> (1) The extent of control exercised over the details of the work;
> (2) Whether or not the one employed is engaged in a distinct occupation or

12

business;
(3) The skill required in the particular occupation;
(4) Whether the employer supplies the tools and place of work for the person doing the work;
(5) The length of time for which the person is employed;
(6) The method of payment, whether by the time or by the job; and
(7) Whether or not the work is a part of the regular business of the employer.

*College Network*, 114 So. 3d at 745 (¶14) (quoting *PDN*, 586 So. 2d at 841-42).

¶30.    "The true test incorporates a consideration of all of the facts and the economic realities." *Sun Vista*, 52 So. 3d at 1268 (¶19) (quoting *Miss. Emp. Sec. Comm'n v. Total Care Inc.*, 586 So. 2d 834, 838 (Miss. 1991)). When examining the relationship between the parties, it is not dispositive if an individual signs an agreement entitled "Independent Subcontractor" or receives a tax form 1099. *See Hill v. City of Horn Lake*, 160 So. 3d 671, 676 (¶12) (Miss. 2015) ("An employer may not escape liability . . . by drafting a contract that labels its employee an independent contractor."); *Sun Vista*, 52 So. 3d at 1268 (¶19) ("[T]he fact that the company issued . . . a Form 1099 does not change the fact that a master/servant relationship existed." (internal quotation marks omitted)).

### 1.    Extent of Control over the Details of the Work

¶31.    Again, the primary factor in determining whether Williams was an employee of Handyman is whether Handyman had the right to control Williams' general maintenance work on residential homes. *See Georgia-Pacific Corp. v. Crosby*, 393 So. 2d 1348, 1349 (Miss. 1981). Handyman told Williams when to arrive at each job. Handyman determined how many jobs Williams would take. Handyman's project managers determined whether to

13

call Williams for a project. Williams was also on a thirty-day probationary period. Williams went to the customer's houses to perform the repairs, but Handyman provided the customer's addresses. Williams testified that Handyman required Williams to notify the customer when he was on his way to the customer's home. Handyman required that Williams introduce himself as a Handyman representative and present Handyman's business cards, pamphlets, and brochures. Handyman required that Williams call the project manager about the scope of the work and the estimated pricing before speaking with the customer. Handyman did not allow Williams to speak with the customers, except to estimate pricing, and if there was an issue with the work, the customer would have to call Handyman's office. Once the customer accepted the price, Williams was obligated to call the project manager back and confirm the order. Once the project was completed, Williams gave the customer a Handyman invoice form and collected payment. Handyman reserved the right to discharge Williams at any time.

¶32. Based on these facts, there was substantial evidence that Handyman exerted a right of control over the details of Williams' work.

### 2. Employee's Engagement in a Distinct Occupation or Business

¶33. The facts show that Williams was not engaged in a distinct business or occupation. Williams marked on the Handyman application that he did not have his own business. Williams testified that he was told by one of Handyman's project managers during the interview that he could not solicit other customers or pass out his own business cards. Additionally, Handyman's non-compete agreement prohibited Williams from soliciting any

14

of Handyman's current or future customers even after one year of termination. Accordingly, there was substantial evidence that Williams was not engaged in an occupation or business.

### 3. The Skill Required in the Particular Occupation

¶34. "Unskilled labor is usually performed by those customarily regarded as servants, and a laborer is almost conclusively a servant in spite of the fact that he may nominally contract to do a specified job for a specified price." Restatement (First) of Agency § 220(2) cmt. e (1933). Although hired as a carpenter and general maintenance worker, Williams did not have carpentry skills. For example, Williams testified that he could not build a cabinet. Similarly, Handyman testified that Williams did not perform services above his skill level as he was an unlicensed carpenter. Handyman also stated that for jobs requiring a higher skill level, Handyman would send out other more skillful workers. Based on these facts, we agree that there was substantial evidence showing that Williams did not have the skills required to perform highly specialized work.

### 4. Employer's Supplying of the Tools and Place of Work

¶35. The evidence here is not disputed. Handyman required that Williams have his own reliable transportation. Handyman did not have a place of work to the extent that Handyman did not have an office for workers to perform their service work. Contrastingly, Handyman did have an office for Williams to drop off invoices from customers and receive his payment. Customers could also visit the office and make complaints. Additionally, Handyman used the office to receive applications, handle interviews, and as a place of work for Handyman's

project managers and office staff. Therefore, there was substantial evidence showing that Handyman supplied the tools and the place of work for Williams.

### 5. The Length of Time the Person is Employed

¶36. The facts show that Williams worked for Handyman for a total of eleven days. This factor is not conclusive given that both Handyman and Williams reserved a right to terminate their relationship at any time without liability, and Williams was on a thirty-day probationary period.

### 6. The Method of Payment

¶37. The payment of wages creates a presumption that a relationship is employer-employee rather than employer-independent contractor and is a strong indication of an employer relationship. Miss. Code Ann. § 71-5-11(I)(14). Most importantly, Handyman paid Williams twenty to twenty-five dollars an hour. The record also reflects that Williams could not receive payment directly from a customer. Handyman even testified that it received roughly fifty percent of the profits. Based on these facts, there was substantial evidence showing that Handyman paid Williams by the hour.

### 7. Worker as a Part of the Regular Business

¶38. Handyman provides home repairs and remodeling services to residential customers. Handyman testified that it had been doing so for the past ten years. The record reflects that Williams went to different customer's houses and performed repairs on site. Specifically, the record indicates that Handyman's project managers would call Williams before the repair

16

took place and inspect the work if there was a customer complaint. As the owner of Handyman, Wilson testified that Handyman employs twenty-five workers to carry out repairs and remodeling services and must sometimes hire electricians and other licensed workers to complete a job. There was substantial evidence showing that Williams was a part of the regular business.

¶39. Handyman exercised a right of control over Williams. Williams is a sixty-year-old man with experience only in maintenance work. Handyman knew that Williams did not own his own business and knew that Williams did not have a carpentry license when it hired him to make repairs. After reviewing section 71-5-11 and the economic realities between Handyman and Williams, we conclude that there was substantial evidence showing that Williams was Handyman's employee.

## CONCLUSION

¶40. The Board of Review did not act arbitrarily or capriciously by finding that Williams was Handyman's employee.

¶41. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. BARNES, C.J., AND McCARTY, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**